TOOZE, J.
 

 This is a suit for an injunction and other relief, brought by William W. Gardner and Jessie Gardner, his wife, as plaintiffs, against G. W. Dollina, W. C. Elliott, and Chester I. Elliott, as defendants, and involves rights, to the use of waters from two springs located upon lands owned by plaintiffs in Grant county, Oregon. Upon motion of the plaintiffs, the suit was dismissed as to defendant Dollina.. After a trial upon
 
 *4
 
 the merits, the circuit court entered a decree in favor of defendants Elliott, and plaintiffs appeal.
 

 Water district No. 6 of the state of Oregon was established pursuant to the provisions of § 116-208, OCLA (OES 540.010), and embraces all the lands and waters hereafter mentioned. The defendant Dolliná is the duly appointed watermaster of said district, having been appointed as such by the state engineer under the provisions of §116-301, OCLA (OES 540.020).
 

 The John Day river is a substantial stream of water flowing in a general westerly direction through Grant county, Oregon, and on west to its confluence with the Columbia river. This river has a large number of tributaries. In the section of Grant county involved in this suit, there are a number of streams of water tributary to the John Day river which flow in a general northerly direction from their respective sources to their confluence with said river. Among those streams of water in their order from east to west are the following: Pine creek, Dean creek, Dissel creek, Big Dog creek, Little Dog creek (flows into Big Dog creek), and Little Pine creek.
 

 Prior to and in 1864, as well as subsequently, extensive mining operations were conducted in Sec. 34 of tp. 13 S. R. 32 E. W. M., and Secs. 6 and 7 of tp. 14 S. R. 32 E. W. M. in and near Canyon City, all in Grant county Oregon. In connection with said mining operations and for use as a part thereof, there was constructed in 1864 a contour ditch, known as the Sam Hillis ditch, for the purpose of carrying water from Pine creek to the mining properties. The ditch commences in See. 14, tp. 14 S. R. 32 E. W. M., and the water therein taken from Pine creek flows in a general northerly direction to its confluence with Dean
 
 *5
 
 creek; for a short distance north nse is then apparently made of the channel of Dean creek; on leaving Dean creek, the ditch meanders in a general westerly direction to the scene of the mining operations, crossing Dissel creek and Big Dog creek. The waters of the ditch are carried across Dissel creek and Big Dog creek by the use of flumes, and at other places along the eight-mile route of the ditch, flumes were constructed to carry the water when it was impracticable to dig a ditch. However, the greater portion of the ditch follows along hillsides or mountainsides, with the hillsides or mountainsides being utilized for the southerly bank, and the northerly bank being built up of rock and dirt which evidently was taken from the side of the hill or mountain, or from the ditch itself. No eyewitness testified as to how the ditch was constructed nor as to when it was constructed, but there is ample evidence in the record (including its description, as existing within the memory of eyewitnesses, and photographs of its condition at the time of trial) from which the method of construction may reasonably be inferred. In his memorandum opinion filed upon the trial’s conclusion, the judge stated: “There was no proof before the Court that this ditch was constructed in 1864”. In this statement, the trial judge erred. There was such proof.
 

 The defendant W. C. Elliott testified as follows:
 

 “Q Do you know the Hillis Ditch as it runs through that country up there?
 

 “A Yes, I do. My father and a man by the name of Hillis dug that ditch — started work on that ditch in ’64.”
 

 At the time this testimony was given, the defendant W. C. Elliott was 74 years of age. It is mani
 
 *6
 
 fest, therefore, that he was not testifying to something that was within his own personal knowledge, hut as to an event he learned about from hearing others state the fact. It was clearly hearsay testimony, but was admitted without objection. Being admitted without objection, it has some probative value.
 
 Shephard et ux. v. Purvine et al.,
 
 196 Or 348, 373, 248 P2d 352. Further, the record upon the trial shows beyond all question that there was no dispute between the parties as to the approximate time the ditch was originally constructed.
 

 The Hillis ditch crosses lot No. 1 and runs northerly along the east line of lot No. 2, in Sec. 5, tp. 14, S. R. 32 E. W. M. At that point it makes what is referred to in the record as a “hairpin turn”. The plaintiffs own lot No. 1, and also own the Hillis ditch. Little Hog creek flows northerly from a point near the apex of this hairpin turn, crossing lands of plaintiffs located in Sec. 32, tp. 13 S. R. 32 E. W. M., and also lands of defendants situate in Sees. 29 and 32, tp. 13 S. R. 32 E. W. M.
 

 Immediately south of the Hillis ditch at the apex of .the hairpin turn are located what have been designated by the parties as the “Seep Springs”, and which we will hereafter designate as the seep spring. There is a canyon running southerly and up-grade from the ditch at,the hairpin turn, and the first water noted in connection with the seep spring is approximately 75 feet south in this canyon (not 100 yards as stated by the trial judge), although most of the water is shown close to the ditch. This canyon also continues northerly down-grade from the ditch, and it is in this canyon that Little Dog creek rises. If the waters from the seep spring were not obstructed by the ditch, they would naturally flow down the canyon in a northerly direc
 
 *7
 
 tion to and into Little Dog creek. However, the north bank of the ditch, undisturbed, effectively prevents those waters from reaching Little Dog creek, and their only outlet is the ditch itself (except, of course, such of the waters as may seep through the ditch or may be conducted over or through the ditch by artificial means).
 

 About
 
 200 feet northeasterly
 
 from the seep spring and in the south bank of the Hillis ditch is located what the parties designate as the rock spring. In his memorandum opinion, the trial judge referred to this spring as follows:
 
 “
 
 The other spring claimed by plaintiffs is called Rock Spring. It also starts in Section 5, about
 
 one-fourth mile
 
 east of Seep Spring. Its source is very close to the Sam Hillis Ditch.” (Italics ours). The trial judge is in error as to the distance between the two springs. However that may be, if it were not for the north bank of the Hillis ditch, the waters of rock spring would flow down the easterly side of the canyon above mentioned and eventually find their way into Little Dog creek. Because of the north bank of the ditch, their only outlet is into the ditch itself. Sometime after plaintiffs purchased their lands and the Hillis ditch in 1942, plaintiff William W. Gardner blasted the rock bank at the rock spring in an attempt to enlarge the flow of water from the spring, but the water from the spring did not then, nor did it thereafter, accumulate at a level much above that of the bottom of the ditch.
 

 The right to the waters of these two springs is the bone of contention between the Gardners and the Elliotts. Defendants contend that they are the headwaters of Little Dog creek, in which they have an adjudicated water right, and, therefore, they are en
 
 *8
 
 titled to the unobstructed flow of water therefrom. The trial court so found.
 

 In his memorandum opinion, the trial judge commented upon the testimony of one Nathan Butler, a seventy-year-old witness for defendants, and evidently gave considerable weight thereto. The court stated:
 

 “The testimony of Nathan Butler, a witness for defendants, testified that he was seventy years old and was born on the W. C. Elliott Ranch and lived there for thirty years and that Little Dog Creek is made by springs at the head of the canyon. Meaning, Rock Spring and Seep Spring. Witness pointed out Rock Spring on the map and testified that
 
 Rock Spring had a flume over Sam Hillis Ditch.
 
 This witness made a map, defendants Exhibit 18 [plaintiffs’ exhibit 18], showing flume from Rock Spring across Sam Hillis Ditch and also Little Dog Creek Canyon which would be the ravine or gully which carries the water from Seep Spring to the Sam Hillis Ditch.” (Italics ours.)
 

 We will later attach a copy of exhibit 18 to this opinion and discuss it in some detail, but at the moment our discussion will be confined largely to the statement that “Rock Spring had a flume
 
 over
 
 Sam Hillis Ditch.” From a careful examination of the entire record, including all exhibits, we are of the opinion that Butler was mistaken in his testimony about such a flume. We believe that he in fact had in mind a wasteway located in the north bank of the ditch a short distance west of the spring, and was confused. At numerous places along the ditch wasteways had been constructed in the north bank of the ditch to provide an outlet for the waters in the ditch when it became necessary to remove such waters for the purposes of repair or cleaning of the ditch, and one of such waste-ways is located about 100 feet westerly (actually south
 
 *9
 
 westerly) from the rock spring. Without the use of a pumping device, it would he a physical impossibility to carry the waters of the spring
 
 “over
 
 the Sam Hillis Ditch” by a flume, because the level of those waters is but slightly higher than the level of the bottom of the ditch.
 

 We take further notice of the statement of the trial judge that Butler had lived on the premises now owned by the Elliotts for
 
 30
 
 years. The record shows that Butler actually did not know how long he had lived there. The confusion exhibited by the witness as to this fact leads us to believe that he may have been confused as to other facts to which he testified. We quote from his direct testimony:
 

 “Q * * * Is my understanding correct that you lived in this country and on this Butler ranch until you were about 39 years of age?
 

 “A Yes.
 

 “THE COURT: What age? 30 or 39? How old were you there on the ranch?
 

 “A I am 70 and I have been away from there for — I haven’t worked on the ranch for a number of years.
 

 “THE COURT: Well, you were born there. About 30 years, I understood you to say, until you were 30; but now you say ‘39’.
 

 “A I was born on the ranch in the year of ’82.
 

 “Q Maybe we can get at it this way. You were born in 1882. Do you remember what year it was you left the ranch?
 

 “A No, I don’t remember, quite.
 

 “Q And now, so we can get on to something else, how long was it you think you lived on the ranch, from the time you were born until the time you left?
 

 “A I could have been 25, but. I don’t think I was, hardly.
 

 
 *10
 
 “Q Well, then, either I am confused or you are. I first thought you said you were 30?
 

 “A It is awful hard, you know, to pick up that —it is a good many years back.
 

 “Q I thought you might recall some date or incident or circumstance that would enable you to know about what year you left the ranch.
 

 “A No, I can’t; I couldn’t quite tell you.
 

 “Q Well, I don’t want to mislead you nor the Court, most certainly. I thought one time you said 30 and 39 and now 25 — I am just trying to get close to the fact.
 

 “A It would be somewhere around about 1902, I know, because I worked at the Prairie Diggins Mine the year of 1902 and I wasn’t on the ranch then. [He was 20 years old in 1902.] ”
 

 In 1930 there was filed with the county clerk of Grant county the findings and order of determination of the state engineer, in the matter of the determination of the relative rights to the waters of the John Day river and its tributaries. This was done pursuant to the provisions of our Water Code. §§ 116-801 to 116-823, OCLA (OES 539.020 to 539.220; 541.320).
 

 Section 116-811, OCLA (OES 539.120) provides:
 

 “It shall be the duty of the state engineer, or some qualified assistant, to proceed at the time specified in the notice to the parties on said stream to make an examination of said stream and the works diverting water therefrom, said examination to include the measurement of the discharge of said stream and of the carrying capacity of the various ditches and canals, and examination of irrigated lands; and an approximate measurement of the lands irrigated from the various ditches and canals; and to take such other steps and gather such other data and information as may be essential to the proper understanding of the relative rights of the parties interested; which said observation and
 
 *11
 
 measurement shall he reduced to writing and made a matter of record in his office,
 
 cmd it shall be the duty of the state engineer to make
 
 or cause to be made
 
 a map or plat
 
 on a scale of not less than one inch to the mile,
 
 showing with substantial accuracy the course of said stream,
 
 the location of each ditch or canal diverting water therefrom, and the legal subdivisions of lands which have been irrigated.” (Italics ours.)
 

 In connection with the above-mentioned determination of water rights, the state engineer made the examination required by § 116-811, OCLA, supra, in October, 1925, and prepared a map reflecting the results of such examination. This map was admitted in evidence as defendants’ exhibit A. We have caused a portion of the map to be reproduced for the purposes of this opinion. The reproduction covers all the territory with which we are particularly concerned in this litigation. It is an exact reproduction except that we have added thereto an arrow and in parenthesis the words “Hairpin Turn” and “Hillis Ditch”. The top of the map is north. Sections 4 and 5 are in township 14 South of Range 32 East of the Willamette meridian, and Secs. 31, 32, and 33 are in township 13 South of Range 32 East of the Willamette meridian. The shaded areas on the map represent the location of irrigated lands. The long dotted and broken line running from the east to the west designates the location of the Sam Hillis ditch. Other dotted and broken lines represent irrigation ditches.
 
 All flowing streams, such as Big Dog creek and Little Dog creek are represented by double, unbroken lines.
 
 For reference purposes, we attach a copy of this reproduction of the state engineer’s map hereto.
 

 By the determination of 1930, water rights were confirmed in one D. W. Fisk, a predecessor in interest
 
 *12
 
 of defendants, as follows: with a priority of 1875, the right to irrigate 42 acres of land by use of the Rinehart ditch out of Little Dog creek and Dog creek; also with a priority of 1880, the right to irrigate 2 acres of land by use of the Lower Rinehart ditch out of Dog-creek ; also with a priority of 1887, the right to irrigate 8 acres of land by use of the Fisk ditch, out of Big Dog creek; also with a priority of 1893, the right to irrigate 48.9 acres of land by use of the Hillis ditch, out of Pine creek. Water rights were confirmed in defendant William C. Elliott as follows: with a priority of 1870, the right to irrigate 151.1 acres of land by use of the Rinehart ditch, out of Big Dog creek. To this determination and in parentheses immediately following it, we read the following: “(NOTE: One-fourth of the total water supply used on the above lands is obtained under a supplemental appropriation from Little Dog Creek, covered by proof 407-A. * * *.) ” Proof No. 407-A is next set forth in the determination. With a priority of 1870, there is confirmed in William C. Elliott the right to irrigate 151.1 acres of land by use of an unnamed ditch, out of Little Dog creek. To this determination and in parentheses immediately following it, is the following notation: “ (NOTE: Supplemental to appropriation from Big Dog Creek under Proof 406-A. This appropriation furnishing about one-fourth of the supply used for the 151.1 acres described in said proof. * * *.)”
 

 It will be observed that in neither of these appropriations is mention made of the seep spring or the rock spring.
 
 The appropriation was made from Little Dog creek.
 
 It is obvious that it was an appropriation made in contemplation of the waters then flowing in Little Dog creek, regardless of their then source.
 
 It was not made in the light of what conditions might
 

 
 *13
 

 
 *14
 

 have been many years before.
 
 As we shall later point out with more particularity, the state engineer’s map (exhibit A) demonstrates that fact.
 

 As a part of the same determination of water rights in 1930, there was confirmed in C. L. Eoddiek, a predecessor in interest of plaintiffs, the following: with a priority of 1880, the right to irrigate 65.4 acres of land by use of the Hillis ditch, out of Big' Pine creek. Appended to this latter determination is the following note: “(NOTE: The land in Section 31 and 9.2 acres in SW% SWli of Section 32, have a supplemental supply from Little Pine Creek under the Barnard Ditch with priority of 1888, under Proof No. 1154.).
 

 Neither plaintiffs nor their predecessors in interest ever filed for an appropriation of waters out of Little Dog creek, but for a period of many years continuously have made use of the waters of the two springs in question. They have no right to take water from Little Dog creek as such, but that does not necessarily mean that they do not have an exclusive right to the waters of the springs. If at the time of the appropriation by defendants of the waters of Little Dog creek, [the spring's in question were not emptying their waters into that creek, or, in other words, were not in fact at the time a part of the headwaters of the creek, defendants gained no rights to the waters of the springs by their appropriation of water out of the stream.
 

 There is no evidence in the record from which it might be determined with any degree of certainty that the two springs in question as sources of flowing water were in existence prior to the digging of the Hillis ditch. Based upon his mining experiences, the
 
 *15
 
 plaintiff William Gardner expressed a theory respecting the development of these springs. He testified:
 

 “A
 
 The one over there, Mr. Hallock, that is mentioned as the rock spring, I have been a miner in my life and I am acquainted with the water underground to some extent, and, I am no expert, but I know something about it, and I have got— the country and the evidence on the hillside shows that it is just possible and I think it was, at one time there was no spring there, but their shooting through solid rock, when they run the ditch through there, they possibly opened up this water course, and I think they did. That, at the time, there wasn’t even a spring higher up in the ditch, and that opened up the other one [seep spring] that we are talking about over in the center. Now, without a doubt, it is a continuation of the same underground source, I would say. I am not posing as a water expert or an underground water man of any kind, but those courses — the fracture in the earth will usually take a fairly straight course, and both probably come from the same underground source, although I don’t know how far down, and I would say that the chances are very favorable that that one rock spring was caused by shooting solid rock in the side Mil. That is what I based my opinion on, that one spring wasn’t here when the ditch was begun.”
 

 Although this seems to be a reasonable theory, and there is no evidence in the record to the contrary, nevertheless, we reject it and proceed upon the assumption that the two springs were in existence prior to and at the time of the construction of the Hillis ditch.
 

 At the time the Hillis ditch was constructed, all the territory involved in this proceeding was a part of the public domain of the United States. No patents had been issued for any part thereof. The first patent covering any of the lands involved in this suit was issued July 1, 1872, to David B. Rinehart for the
 
 *16
 
 of SE14 of Sec. 30, and of NE of Sec. 31, tp. 13 S. R. 32 E. W. M.; the second patent was issued March 1, 1883, to David B. Rinehart, for the
 
 Ey2
 
 of SW14 and Ni/? of SE14 of See. 30, tp. 13 S. R. 32 E. W. M.; the third patent was issued May 18, 1888, to Daniel M. Butler, for the Sy> of NE14 and
 
 Ey2
 
 of SE % of Sec. 32, tp. 13 S. R. 32 E. W. M.; the fourth patent was issued July 2, 1889, to D.
 
 W.
 
 Fisk, for the NW14 of the NE14 and the N% of NW14 and SE14 of NW14 of Sec. 32, tp. 13 S. R. 32 E. W. M.; the fifth patent was issued November 10, 1921, to D. W. Fisk for lot 2, Sec. 33, and the NE14 of NE14 of Sec. 32, tp. 13 S. R. 32 E. W. M. Together, the defendants own all of the lands covered by those patents as described above, although each of them owns his own separate portion of said real property. Plaintiffs own the following lands: Ey> of SW14, Wy> of SE14 of Sec. 32, tp. 13 S. R. 32 E. W. M.; lots 1 and 2 and W% of SE14 of Sec. 5; lots 2, 3, and 4, and the NE14 of SW14 of Sec. 4; the S% of SW% of Sec. 4; and the
 
 m/2
 
 of NW% of Sec. 9, all in tp. 14 S. R. 32 E.
 
 W.
 
 M. ; the Sy2 of SE% of Sec. 31; SW% of SWy4 of See. 32, tp. 13 S. R. 32 E. W. M.; and lot 4 of Sec. 5, tp. 14 S. R. 32 E. W. M. Also, the NW% of SWy4 of Sec. 4; the E% of SE14; and the SW14 of Sec. 5; the Ny> of NE14, the SW14 of NE%, the NW%, the NE% of SW14, and NW14 of SE}4 of Sec. 8, all in tp. 14 S. R. 32 E. W. M.; also, NW& of Sec. 14, tp. 14 S. R. 31 E. W. M.; the N% of SW%, the SE% of SW%, the NW%, the NWy4 of SEy4 of Sec. 14, tp. 14 S. R. 31 E. W. M. Also, “The ‘Hillis Ditch’ which heads at Pine creek in Sec. 1, tp. 14 S. R. 32 E. W. M., together with any and all water-rights now owned by the grantor herein”. This quote is taken from the warranty deed executed and delivered October 10, 1942, by Margaret
 
 *17
 
 Mulcare, widow of John D. Mulcare, who died in 1942, the plaintiffs being the grantees named in said deed. John D. Mulcare became the owner of the Hillis ditch by virtue of a deed duly executed and delivered to him on March 23, 1936, by the owners thereof.
 

 John D. Mulcare purchased the lands deeded to plaintiffs from C. L. Roddick in the fall of 1930. With his wife Margaret, he immediately moved upon the premises. John Mulcare and Margaret were married in 1929. Roddick had purchased the lands and took up residence thereon in 1920. These dates are important in connection with one phase of the case hereafter to be discussed. At one time one Richardson owned a portion of the lands located immediately westerly and northerly of the hairpin turn in the Hillis ditch, and one Ward owned a portion of the lands located north of the ditch.
 

 By referring to defendants’ exhibit A, supra, it will be noted that immediately north of the hairpin turn and for some distance along Little Dog creek on the west side thereof there is an irrigated area. Irrigation ditches are shown, one out of Hillis ditch starting just north and west of the hairpin turn arid running northerly. Another is shown as commencing at the head of Little Dog creek just north of the hairpin turn and going northerly to its connection with the ditch leaving the Hillis ditch. The plaintiff William W. Gardner testified to the existence of other irrigation ditches going westerly from Little Dog creek and taking water therefrom for the irrigation of the lands owned by Gardner lying immediately west of that stream. There were six of these ditches in existence when Gardner went upon the premises, and he dug another toward the lower end of Little Dog creek. The waters in these ditches after use for irrigation
 
 *18
 
 purposes would, to some extent, find their way back into Little Dog creek. The evidence does not disclose just when these small ditches, other than the seventh, were dug, but it is reasonable to infer that they came into existence during the time the Huleares occupied the premises, or at least after the state engineer made his survey and map in 1925; i.e., defendants’ exhibit A.
 

 Upon the trial William Gardner testified that he continuously made use of these small ditches carrying water out of Little Dog creek for irrigation purposes without complaint or hindrance by anyone until 1949, with the exception of the seventh ditch which he himself had dug. His use of that ditch was interfered with, although he did not know the person responsible therefor. The evidence disclosed that that interference came from defendant Chester I. Elliott.
 

 For our purposes, we need not discuss the somewhat involved explanation given by Gardner respecting his claim to a right to use a portion of the waters of Little Dog creek, taking the same directly from the stream through the seven ditches mentioned. However, he also claimed that he has acquired right to such waters against defendants by adverse use for more than the statutory period of prescription (10 years). That question is fully argued in the briefs of respective counsel. However, we are satisfied from the record that defendants did not abandon or forfeit their appropriated right in the waters of Little Dog creek, and hence it is unnecessary for us to discuss the claim of adverse user. We repeat what was said in
 
 Tudor v. Jaca et al.,
 
 178 Or 126, 152, 164 P2d 680, 165 P2d 770:
 

 u *
 
 * * it is a debatable question, under the water code, whether, subsequent to 1909 [when our water code was enacted and became effective], an
 
 *19
 
 appropriation of water can be initiated by adverse use, or in any other manner than under the statutory procedure. Section 116-419, et seq., OCLA [OES 537.130, et seq.]. Such procedure is declared to be exclusive. Section 116-402, OCLA [OES 537.120].”
 

 Gardner also testified that no claim was ever made to him that he did not own the waters of the two springs, nor was any demand made upon him for any part of the waters thereof, nor was his own use thereof ever hindered or questioned, until 1949. Both defendants testified that they did interfere with the use of the springs by Gardner prior to 1949, but both admitted that they had never talked with Gardner respecting that matter, nor made any personal demands upon him.
 

 Mrs. Muleare (now Mrs. Leuck) also testified that during the time she and her husband lived upon the premises there was no interference by anyone with their use of the springs. She testified as follows:
 

 “Q Did you and your husband in the operation of your ranch use the water from those two springs through Hillis Ditch?
 

 “A Yes.
 

 “Q What did you use it for, generally?
 

 “A We used it for household use, part of the year, and for livestock water and irrigating.
 

 “Q How did you use it for household use?
 

 “ A During parts of the year our spring wasn’t sufficient at the house to supply the water, so that water was brought around to supplement.
 

 “Q What I am getting at, did it come directly to your house or was it used to keep up the flow?
 

 “A Just to keep it up. We ran it into the spring.
 

 “Q And your house is the same house as the Gardner house?
 

 “A Yes.
 

 I l
 
 $ * * * *
 

 
 *20
 
 “Q During the period of time you were on the ranch, did you use the water of Big Pine creek through the Hillis Ditch?
 

 “A Yes.
 

 “Q And did you do that every year?
 

 “A It was used every year, uh huh.
 

 “Q What — let’s get it this way — what time of the year did you have to quit using the water from Big Pine Creek?
 

 [Note: Other appropriators had water rights in Big Pine creek, and to protect those rights the water in Hillis ditch would be cut off at the source by the watermaster about July 1 of each year; later, he cut off the water in the Hillis ditch about August 1.]
 

 “A Generally July 1.
 

 “Q And after that, what water was used for stock water, along the Hillis ditch?
 

 “A The water that came from the springs.
 

 “Q During the entire period' that you were on the ranch, did anyone ever make any claim to the waters of these two springs other than yourself?
 

 “ [Objection made and sustained.]
 

 “Q Did anyone ever come to you and demand water of either of those two springs?
 

 “A No.
 

 “Q During the time you were there, did anyone else ever use the waters from either of those two springs ?
 

 “A No.
 

 i i
 
 ft ft ft ft ft
 

 “Q During the period that you were on the ranch, W. C. Elliott lived where he does now?
 

 “A
 
 Yes.
 

 “Q And where did Brick Elliott — Chester Elliott — live?
 

 “A
 
 Part of the time on the homestead and part of the time where he presently lives.
 

 “Q Did either of them ever make any claim to you, to the waters of either of these springs?
 

 “A No.”
 

 
 *21
 
 Mrs. Mulcare was a disinterested witness. She had nothing whatever to lose or gain by her testimony. She was testifying to matters of comparatively recent date. She not only attended to her housework and cared for her children while on the premises, but also actively participated with her husband in the work of the ranch. We are of the opinion that she was worthy of belief, particularly because her testimony coincides with all the other facts and circumstances of the case.
 

 Plaintiffs incurred considerable difficulty and expense in the maintenance of the flumes constructed as parts of the Hillis ditch. When those flumes gave away, the flow of water in the ditch would cease, except the water coming from the springs. This also was true each year when the watermaster shut off the waters at their source in Big Pine creek in July or early August.
 

 Although the defendants testified to the contrary, in our opinion there yet is a preponderance of evidence to the effect that defendants made no claims to the springs ’ waters, nor in any way interfered with the use thereof by the plaintiffs or the Mulcares, until 1949. Apparently during that year, or in 1950, the defendant Chester I. Elliott complained to the defendant Dollina and claimed the waters of the springs as being the headwaters of Little Dog creek, in which defendants held the appropriated water right previously mentioned.
 

 In 1949 the defendant Chester I. Elliott presumably constructed a small dam across the Hillis ditch just west of the wasteway located in the north bank of the ditch. This had the effect of backing up the waters from rock spring to such a depth that they would flow out through the opening or gate in the wasteway. When plaintiff William Gardner discovered this dam,
 
 *22
 
 he destroyed it. Another dam was immediately constructed to take its place, and this also was destroyed by Gardner. In August, 1950, a small dam was again constructed at the same place, which Gardner removed. None of these dams had any effect upon the waters of the seep spring.
 

 Late in the summer of 1951 a photograph was taken of the ditch and wasteway. It shows the north bank and bottom of the ditch, together with the wasteway. The gate in the wasteway is open, the gate lying on top of the wasteway. A small dam is shown in the foreground, crossing the ditch near the lower side of the opening in the wasteway. This dam is similar to those constructed in 1949 and 1950, which were removed by Gardner. The bottom of the gate opening is approximately four inches higher than the bed of the ditch, so that without the dam, the waters from the spring would not flow through the wasteway when the gate is open. The body of water shown in the foreground and held by the dam is water from rock spring-. The spring is located upstream approximately 100 feet distant. This photograph was admitted in evidence as plaintiffs’ exhibit 1. We attach a reproduction thereof, reduced in size, to this opinion.
 

 In the summer of 1950, the defendant Dollina, as watermaster and acting upon the complaint of defendants, went upon the premises owned by plaintiffs and viewed the conditions there existing. He decided for himself that the rock spring and the seep spring were the headwaters of Little Dog creek as claimed by defendants and took action accordingly. About 100 feet northerly and westerly from the apex of the hairpin turn, Dollina excavated a cut through the north bank of the ditch so that the waters of the seep spring would flow through that cut and down the west side
 
 *23
 
 of the canyon into Little Dog creek. Acting upon the advice of his attorneys, the plaintiff Gardner replaced the hank of the ditch at the point in question. Later, Dollina admitted to Gardner that he had no right to make the cut in the ditch hank.
 

 In August, 1951, a new dam was built near the place where the dams of 1949 and 1950 were constructed,
 

 Plaintiffs’ Exhibit 1
 

 and, in addition thereto, Dollina made a cut through the north bank of the Hillis ditch at the hairpin turn and installed therein a 10-inch pipe which ran across the ditch southerly to the outlet of the seep spring. The pipe was supported by a prop constructed in the ditch. The narrowing of the outlet of the seep spring to the size of the pipe resulted in all the waters thereof (except a small part that might have escaped) being carried by the pipe through and beyond the north bank of the ditch, where they ran down the canyon in a
 
 *24
 
 natural channel to their junction with Little Dog creek. Dollina also posted notices that the changes he made in the ditch were not to be interfered with, one of the notices being posted on the front of the wasteway and the other, near the place where the pipe was installed. The one on the wasteway may be noted in plaintiffs’ exhibit 1. Thereafter, plaintiffs, acting upon the advice of counsel, did not directly interfere with the waters of the two springs. Instead, they commenced this suit.
 

 During the trial of this suit, when the trial judge viewed the premises, the situation then existing as to the flow of waters of the springs was as created by Dollina in 1951. From the seep spring there was a continuous flow of water through the pipe downgrade to Little Dog creek, which gave the appearance that the seep spring formed a part of the headwaters of that stream. The waters of rock spring, backed up by the dam, were flowing through the open wasteway down the canyonside, finding their way into Little Dog creek.
 

 It is obvious that neither Dollina nor the defendants had any right or authority to place dams in Hillis ditch or make cuts through its north bank. They were trespassers upon plaintiffs’ lands.
 
 Minton v. Coast Property Corporation,
 
 151 Or 208, 216, 46 P2d 1029, 297 US 704, 56 S Ct 442, 80 L ed 992. However, their wrongful acts in no way affected any rights that plaintiffs may have had or have in the springs.
 

 Upon the trial, in support of their contention that the two springs were in fact the headwaters of Little Dog creek, defendants sought to prove that in the ¡original construction ''of Hillis ditch there was no interference with the flow of the waters therefrom, and that after the construction was completed, the
 
 *25
 
 waters continued to flow down the canyon in natural channels as a part of the established flow of water in Little Dog creek. They contended and sought to prove that at the location of the rock spring a flume was constructed to carry the waters in the ditch, thus permitting the spring waters to flow unobstructed, as they w^ere wont to flow, down the east side of the canyon into the main channel of Little Dog creek. They also contended and sought to prove that at the location of the seep spring a flume was constructed by the builders to carry the ditch’s waters directly across the canyon, instead of continuing with the digging of the ditch at that point in keeping with the general plan of its construction.
 

 The record is replete with testimony respecting flumes erected along the course of the Hillis ditch as parts thereof. Although there is an abundance of evidence as to these flumes, the testimony is extremely confusing and contradictory. There is no question but that flumes were constructed over Dissel and Big Dog creeks. The confusion and contradictions in the testimony concern other alleged flumes, and particularly the two flumes claimed by defendants to have been constructed at the sites of the two springs. However, despite this confusion, we believe the truth may be garnered from the record by a consideration of all the known facts and circumstances of the case, and the reasonable inferences that may be drawn therefrom.
 

 The trial judge found in favor of defendants. He found that the two springs were the headwaters of Little Dog creek. By reason of that, defendants urge upon us the application of the rule often stated by this court, that upon the hearing of equity cases on appeal, where we try the cases de novo, great weight will be given to the trial court’s findings upon disputed
 
 *26
 
 questions of fact, and insist that we should adopt such findings in this case. Defendants devoted ten pages of their brief to this point. It is unnecessary for us to discuss this contention. We simply call attention to the rule as stated in
 
 Meads v. Stott,
 
 193 Or 509, 541, 238 P2d 256, 239 P2d 594:
 

 “This is a suit in equity, and it is tried de novo in this court. We have a responsibility to consider and weigh all facts in the case and to arrive at our own independent conclusion as to wherein lies the truth. Though the initial determination by the trial judge is entitled to great weight, largely because he has the advantage of observing the conduct and demeanor of the witnesses, whereas we are necessarily confined to a study of the cold, printed record, nevertheless, we are not bound by his findings, and the rule mentioned is one of expediency only. ’ ’
 

 To begin with,
 
 there is no testimony whatever in the record as to any flumes being erected as a part of the ditch, where it ran along a hillside or mountainside, at any point along its entire eight-mile route, except at the sites of the two springs in question.
 
 That circumstance is most significant.
 

 The record discloses that at one time a temporary flume was constructed to carry the waters of the Hillis ditch past the rock spring, and that during the time the flume was used water flowed thereunder from the spring and down the canyonside into Little Dog creek. That condition, however, was a temporary one. The evidence satisfactorily shows that the flume was constructed in 1920, or later, and that it was removed and the north bank of the ditch restored prior to the fall of 1930, when the Huleares took possession of the premises. Nathan Butler, who testified to conditions existing between 1882, when he was born, and 1902,
 
 *27
 
 when he left home, made no mention of snch a flnme as a part of the ditch. He spoke only of a flume which he said went ‘
 
 ‘
 
 over ’ ’ the ditch at rock spring. A drawing that he made (plaintiffs’ exhibit 18), which we will hereafter discuss, discloses that fact.
 

 The necessity for the construction of that temporary flume near rock spring arose when one Ward, in an attempt to tap the waters of rock spring, undermined the Hillis ditch by digging a tunnel thereunder in the vicinity of the spring. Ward owned a place north of the ditch (now owned by plaintiffs). The situation will be made clear by reference to certain portions of the testimony.
 

 The witness Gardner was examined as to his use of the waters directly out of Little Dog creek through the seven irrigation ditches heretofore mentioned. In the course of that examination, he testified as follows:
 

 “Q I see. Eastward from this hairpin turn— or westward, rather — from the hairpin turn, was there ever — were there any evidences of this bank— the north bank of the canal [Hillis ditch] — having been broken at any time prior to that [sometime after Gardner purchased the property and when he was engaged in operations to enlarge the flow of water from the springs] ?
 

 “A Yes, sir, there was a wash, a big wash, where evidently the big ditch had broken at one time and washed the side hill off.
 

 i Í
 
 # * # $ #
 

 “Q Now, Mr. Gardner, you know no doubt, because you must have consulted the records by this time — or your counsel did — that it is the Elliott’s property that has all of the adjudicated rights out of Little Dog creek. Is that right? Do you know that?
 

 “A Yes, sir.
 

 
 *28
 
 “Q And, nevertheless, you say that you are still claiming that you have rights to the stream flow of Little Dog creek?
 

 “ [Argument by counsel.]
 

 “A Yes. I will answer that question, I claim the waters and for one reason. I have been told by several oldtimers that at the time that ditch was put in, which was far, far, ahead of any ranch rights or any establishment of any ranches, that there was no such thing as springs under that ditch and that Mr. Ward — who lived on the Ward place that belongs to me — went up and dug in such a way under that ditch that he caused the spring to break out underneath the ditch which if was the case, I had always figured it was still my water. He had no right to tap that spring from underneath that ditch when the ditch was put there, before there was any state water rights and before there was any adjudication of the water, so I took the water under that assumption, and wasn’t contested.
 

 G $ # * #
 

 “Q How long is Little Dog Creek?
 

 “A I haven’t any idea after it runs off of my land, but practically, I would say a mile.
 

 “Q What is its source, Mr. Gardner? What is the source of Little Dog Creek?
 

 “A The source of Little Dog Creek is a spring, as of the present time, it comes up under the ditch.
 

 (£ *35- ^
 

 ‘ ‘ Q Then you also claim, as I understand it, what you can collect in the Hillis Ditch at the rock where there was some blasting done and what we refer to sometimes as the rock spring? you claim all of the water that you impound there in the Hillis Ditch, is that it?
 

 “A Yes, sir.
 

 “Q And then, you told us a very substantial quantity of water comes out below Hillis Ditch at
 
 *29
 
 the point marked ‘source’ on exhibit 7. Do you claim any of that water as yours?
 

 “A I always have, sir, because I have never been interfered with taking, and I have been told as stated before, that Mr. Ward did certain work under the ditch which caused most of that water to show up under the ditch and break the ditch bank, and I knew no better, and I had undisputed use of the water for seven years, and I thought naturally it belonged to me, so I claimed it.”
 

 E. W. Cresap, Margaret Mulcare Leuck’s uncle, testified as a witness for plaintiffs. He was born in Canyon City and lived continuously in Grant county thereafter. At the time of trial he was 61 years of age. When he was 15 years of age he commenced working in the mines for his father and another. The water for the mining operations came out of the Hillis ditch. By his testimony Cresap exhibited a familiarity with the Hillis ditch extending over a period of many years. He related his earliest recollections of the ditch at the site of the rock spring. He testified as follows:
 

 “Q And did the spring [rock] run into or out of the Hillis Ditch?
 

 “A It ran into the Hillis Ditch — the biggest majority of it.
 

 “Q And through the years, as you grew up and saw it, was there a ditch there at the point of the spring or a flume or what?
 

 “A Well, they [sic] was a ditch, but in later years it was a flume.
 

 “Q What made the change?
 

 ‘ ‘ A Well, I couldn’t swear to this, but the miners told me and laughed about it. Cy Roddick was the one who told me, that George Ward made a cut up in there, trying to tap that spring and the ditch slid out and they had to build a flume.
 

 
 *30
 
 “Q Now, the flume, was that a complete flume or was that—
 

 “A A complete flume.
 

 “Q And that was at or about the point where this spring [rock] is, we are talking about?
 

 “A That is right.
 

 ‘ ‘ Q When you were up there the other day, did you see any evidences of that flume?
 

 “A I could see some old boards.”
 

 In one of the scenes in a View Master reel marked plaintiffs’ exhibit 8-a, some old boards are shown lying near the spring on the south side of the ditch next to the rock wall. No doubt those are the old boards referred to by Cresap.
 

 Glen Tracy, who was 57 years of age at the time of trial, testified on behalf of defendants. He was born in Grant county and had lived there continuously since. He was familiar with the Hillis ditch. His stepfather was C. L. Roddick, who owned the premises now owned by plaintiffs, and who' went upon and occupied the lands in question in 1920. He testified that he' observed a flume at the site of the rock spring which carried the Hillis ditch waters, and, upon cross-examination, gave testimony as follows:
 

 “Q I am talking about the flumes that were there when you were there. Now, the flume which you say is on — at the rock spring- — how long since you were there at that exact spot?
 

 “A I couldn’t tell you the exact time.
 

 “Q Well, can’t you make an estimate of.it, .Mr. Tracy?
 

 “A Well, I might have been there since.I repaired that flume and I don’t recollect.
 

 
 *31
 
 “Q When were you last there that you do remember?
 

 “A Well, my stepfather [C. L. Roddick],
 
 when he owned the ranch,
 
 I remember,
 
 built that flume.”
 
 (Italics ours.)
 

 It is, therefore, manifest that there was no flume at the site of the rock spring until Roddick built one to take the place of the north ditch bank which had been washed out as the result of Ward’s actions. And as before observed, Roddick must have removed the flume and restored the ditch bank before the Huleares moved upon the premises in 1930.
 

 There were admitted in evidence several View Master reels showing scenes taken with a View Master personal camera. Plaintiffs ’ exhibit 8-a above referred to is one of those. This picture shows a narrowing in the width of the north bank for a short distance immediately west of rock spring. Clearly that is where the wash occurred when Ward tunneled under the ditch. The picture also shows that the north bank at the site of the spring is of very old construction; it is wide and solid with large trees growing therein. The loose log lying lengthwise along the top of the bank marks the location of the place where the ditch bank had been restored. Viewed through a View Master, the photograph clearly depicts the details of the scene at the point in question. From it we are convinced that the bank immediately north of the spring is now as it was originally constructed, as well as the bank immediately west of the restored portion where the wash occurred. Although the details do not show too clearly in the reproduction we had made from the small film (less than the size of a dime), nevertheless, we attach it hereto as a part of this opinion.
 

 
 *32
 
 We conclude, therefore, that if the rock spring was in existence prior to the construction of the ditch, the building of the ditch effectively cut off its waters from any flow other than into the ditch itself (natural seepage through the north bank excepted).
 

 We will now give our attention to the seep spring. As before mentioned, defendants contend that in constructing the Hillis ditch, the persons engaged therein, instead of continuing the ditch along the hillside past the spring, following the natural contour of the terrain at that point (as the ditch now does and unquestionably has done for more than 50 years immediately prior to trial), erected a flume across the canyon at
 

 Plaintiffs’ Exhibit 8-a
 

 
 *33
 
 that point. The testimony respecting the existence of such a flume is indeed most indefinite, uncertain, and confusing. However, in the light of all the known facts and circumstances of the case and the reasonable inferences to be drawn therefrom, we are of the opinion that the existence of such a flume is a mere figment of the imagination.
 

 Had such a flume been constructed, it is reasonable to assume that the builders thereof would have erected it in as straight a line as possible across the canyon, instead of following the contour of the terrain at that location. There would have been no necessity of making a hairpin turn in the ditch as now exists, and such construction would obviously have been bad construction. A mere glance at defendants’ exhibit A, supra, will show the most likely path of such a flume had it been erected. It would have crossed the canyon some little distance north of the apex of the hairpin turn. That would have been an unnecessary and, perhaps, expensive, undertaking, simply providing another flume to maintain, instead of a permanent rock and dirt bank. There was no reason whatever, either factual or legal, which necessitated such construction. No adverse private rights were involved. The United States government at the time owned all the lands involved.
 

 We again refer to testimony given by Nathan Butler, a witness for defendants. He was a brother-in-law of Charles Eichardson, one of plaintiffs’ predecessors in interest. • Eichardson was a homesteader. We find no date in the record when patent was issued to him, but one was eventually issued. However, it will be recalled that Butler was testifying to events and conditions claimed to be within his own personal knowledge that occurred and existed prior to his leav
 
 *34
 
 ing his birthplace (premises now owned by defendants) in 1902, when he was 20 years of age. As a part of his direct examination, he testified as follows:
 

 “Q All right, we will drop that point for a moment. Now, we passed the rocky spring hillside and got np into this hairpin tnrn. Do you remember that part of the ditch? Now, what existed up there south of the hairpin turn on the Hillis ditch at that point?
 

 “A Well, in that turn there, years ago, they used to be a — they used to be a flume in there to run this here early water — if they was a waterspout or something like that, to run that over the ditch so it wouldn’t fill up the ditch.
 
 And they was some springs in above there, and when Mr. Charley Richardson
 
 — after
 
 he taken up his homestead, he used to
 
 — he
 
 was my brother-in-law
 
 — he
 
 used to have a ditch around and above the Hillis Ditch from the Creek there, from the bottom of the Creek, run a little ditch around, and had a little flume in there and he would run it over the top of the ditch and irrigate some ground in below the ditch, off on the left-hand side of the canyon that goes down there below the Hillis Ditch, where this water that raised in
 
 above—
 

 “Q Well, now, explain the situation as you knew it in those days right in that hairpin turn, as to the spring water developed south of the Hillis Ditch. Where did that go, and how was it conducted?
 

 “A I can’t get you, quite?
 

 “Q Well, I will try to make it a little clearer. We are coming westerly along the Hillis Ditch, approaching the territory where the Hillis Ditch scallops around the upper end of Little Dog Creek. When we get around the hairpin turn, you already told us there was a spring to the south of that hairpin turn.
 

 “A
 
 Yes, yes.
 

 
 *35
 
 “Q All right. How did that water from that spring — what became of it? how was it conducted, and where, if you remember?
 

 “A You mean — what spring do you have reference of? Now, there — that—is it the rock spring or what you call the rock spring?
 

 “Q No, what we call the seep spring.
 

 “A The seep spring?
 

 “Q What you said was the head of Little Dog Creek.
 

 1 ‘
 
 ME. KILP ATEICK: No, that was your statement to the witness. This witness has never said this spring was the head of Little Dog Creek, you told him that three times, but he never yet agreed.
 

 “THE COUNT: Let’s proceed and try and avoid leading the witness or suggesting names if you can, I understand you’re having a little difficulty.
 

 ‘ ‘ ME. HALLOCK: If this gentleman would just go ahead and tell me.
 

 “Q Here is what I am going to have you do. I am going to have you step over to this little board—
 

 “A Yes, I understand.
 

 ‘
 
 ‘
 
 Q Just let me finish the question. I am going to have you step over to the board and go ahead in your own way — tell us where these springs were that you were talking about. What became of the water, and how it was handled in the days you knew — just any way you want to describe it.
 

 ‘ME. KILP ATEICK: W ait just a moment, Mr. Hallock, and we will give you a crayon of a different color so that he can mark it. Let the record show that these marks are being made in a green pencil.
 

 £ £ A Now, the way I understand this, this is what you call the rock springs and this here is in the canyon in the main canyon, yeah.
 

 
 *36
 
 “Q Yery well.
 

 “A This is the one that I was referring to here —the seepage vn above here, that used to be. I don’t know what there is now. But, there was quite a seepage in there, and Mr. Charley Richardson used to
 
 — who
 
 had a homestead in there
 
 — this
 
 is the Hillis Ditch, I understand, here
 
 — and
 
 he run a little ditch around above here.
 

 1 ‘
 
 ME. KILPATEICK: Mr. Butler, mark as you go along.
 

 ‘ ‘ THE WITNESS: You want me to mark this f All right.
 

 “A He run a little ditch around in here someway or other, I would say from here around here, some way or another.
 

 “ME. KILPATEICK: Don’t be afraid to bear down-neither the Court nor we can see it.
 

 “A
 
 Any way he put in a little box over this Hillis Ditch and run this water over the ditch here.
 
 Then he had a patch of ground in below here that he irrigated. This piece of ground was around in here —well, it would go, I would say something in that shape, somewhere in there. This little ditch come kind of around like this and for a ways like that, and that is what he irrigated from, that piece of ground there.” (Italics ours.)
 

 From the foregoing testimony, it appears that more than fifty years prior to the trial Charles Eichardson appropriated the waters of seep spring for irrigation purposes by building a ditch therefrom along and above the south bank of Hillis ditch, over the ditch through a flume, and then along the north bank of the ditch to his field. Evidences of that ditch still show on the ground. It is manifest from the description given by Butler of the Eichardson irrigation ditch that at the time of its digging, there was no flume in existence which carried the waters of Hillis ditch past the seep spring. It is clear that the banks of Hillis
 
 *37
 
 ditch around the hairpin turn were then, as they now are, of rock and dirt construction (elevated ground largely forming the south hank).
 

 Butler made a drawing illustrating his testimony (plaintiffs’ exhibit 18). This drawing was on the back of the cardboard bearing a drawing previously made by plaintiff William Gardner (plaintiffs’ exhibit 7). We have caused both these drawings to be reproduced on the same side of a single sheet of paper. They are reduced in size, and for better understanding we have moved the notations made by the authors thereof to more convenient locations on the same. For example, on plaintiffs’ exhibit 7, we have moved the notations “Dam 1951 August; Dam 1949; Dam 1950” with lines and arrows pointing to the spots, to the upper left of the drawing, whereas on the original drawing they are found on the lower right-hand side with long lines and arrows leading to the respective points described. However, the notations are those made by the witnesses themselves. The dotted lines noted as leading from seep spring, crossing Hillis ditch, and ending in a loop on exhibit 7, are lines placed thereon by the witness Butler to indicate the Richardson ditch and field before he was asked to make his own drawing (exhibit 18). We are attaching that reproduction to this opinion so that there may be a better understanding of the situation as outlined by the witnesses.
 

 In Gardner’s drawing, exhibit 7, is noted the word “source”. This is below the Hillis ditch (north) and marks the location of seepage waters and springs described by Gardner as what he claimed to be the headwaters of Little Dog creek. At approximately the same location on exhibit 18, Butler marked the location of the same seepage waters and springs. On exhibit 7, Gardner noted the approximate site of the wasteway
 
 *38
 
 heretofore mentioned. In his drawing, Butler does not show the wasteway, but does show a flume across the ditch near rock spring. As before remarked, we are of the opinion that Butler actually had in mind the wasteway, although he placed it too near rock spring. No other witness claimed that there ever had been a flume over and across the ditch at rock spring, and as we have before pointed out, to carry water directly from the spring through a flume over and across the ditch at that point would have been a physical impossibility. Some distance east of rock spring, Butler marked the location of Chrome road canyon running north and south at that point. He testified that there was a flume erected over the Hillis ditch at that location. Its purpose, he described as follows:
 

 “It was to carry — it was to carry this water over the ditch, to keep the ditch from filling up with rocks and stuff that would come down when there was snow — would be running off- — and so they wouldn’t have to shovel that mud out, and rocks, and stuff.”
 

 Gardner’s drawing shows a cut in the Hillis ditch north bank about 100 feet west of where Dollina cut the bank in 1950. This is where he takes water out of the ditch for irrigation of the land formerly owned by Bichardson. The two parallel lines following the ditch westerly on the north side thereof represent his irrigation ditch. Butler’s drawing shows the location of the ditch, flume, and little ditch which Bichardson used when taking the waters directly from seep spring more than 50 years ago. Butler also marked with an “X” the place he fixed as the beginning of a continuous flow of water in Little Dog creek. This is some distance north of and below the hairpin turn in Hillis ditch. At the top of his drawing, Butler placed
 

 
 *39
 

 the letter “H”, indicating the location of what he considered were the headwaters of Little Dog creek, but that was simply his opinion or conclusion, elicited by counsel after considerable leading of the witness. The
 
 *40
 
 line from “H” to the Hillis ditch and north indicates the canyon. In passing, it might also be noted that defendant Chester I. Elliott also testified to the existence of the seepage and springs at the location which Gardner marked as the source of Little Dog creek.
 

 Mrs. Margaret Mulcare Leuck, on cross-examination, testified as follows:
 

 “Q You know where the head waters of Little Dog Creek are?
 

 “A Of Little Dog Creek?
 

 “Q Yes.
 

 “A Yes.
 

 “Q Where the spring comes out of the canyon?
 

 “A We never considered that headwaters.
 

 “Q What did you consider it?
 

 “A Well, it was just our springs and it wasn’t the headwaters of anything.
 

 a
 
 # * * * #
 

 “Q Would you say if the bank were not there in the hairpin turn, at the ditch, that that water from the spring [seep] would run right down and form a part of Dog Creek — if it weren’t for the bank of Hillis ditch?
 

 “A If the Hillis Ditch weren’t there at all, I guess you would call it the headwaters of Little Dog Creek — I never considered it the headwaters of anything. ’ ’
 

 Now let us refer to defendants’ exhibit A, supra. It will be observed that the double lines indicating the location of Little Dog creek commence a short distance north of the apex of the hairpin turn and continue for a mile until they connect with the double lines marking Big Dog creek. Chester A. Cummings, an assistant to the state engineer (off and on since 1925), called as a witness by defendants, identified defendants’ ex-
 
 *41
 
 Mbit A and described it. Upon cross-examination, he testified:
 

 “Q You are, of course, familiar with these maps and work with them in the course of your adjudication?
 

 “A
 
 Yes.
 

 “Q How are streams shown on this?
 

 “A Ordinarily shown with a double line.”
 

 As of 1925, when the survey was made by the state engineer, it is evident from the map that the beginning of Little Dog creek was north, and not south of the Hillis ditch. That would eliminate seep spring as a part of Little Dog creek. This, of course, is not conclusive, but it is highly significant, particularly when we consider all the other facts and circumstances of the case. It was upon the basis of this survey and map that the rights of defendants are determined as to their use of the waters of Little Dog creek. Cummings also testified that there was no reference whatever in the engineer’s findings to either of the two springs.
 

 We have perhaps devoted more time to a consideration of the mass of evidence in this case than was necessary, yet the vital importance that water plays in the development and economy of the vast areas of arid lands in eastern Oregon, plus a sincere desire to reach the right conclusion in this case, induced us to exercise rather extraordinary care in our review of the record. We have read and reread the entire record. There are many points called to our attention by counsel to which we have made no reference, but by not referring to them we do not wish it to be understood that we did not give each and every one of them thoughtful consideration. However, in the light of all the facts, we are firmly convinced that seep spring has never been nor formed a part of the headwaters
 
 *42
 
 of Little Dog creek since the Hillis ditch was constructed in 1864.
 

 Considering conditions as they existed in 1864, it is manifest that the builders of Hillis ditch were in no way concerned with the waters of a small creek such as Little Dog creek. It could have been dried up completely without injury to anyone. Those men, as well as the United States government itself, were at the time primarily concerned with the mining operations. The government encouraged such mining to the utmost; it needed the output. It will be remembered that it was during those years that a new state was admitted to the union simply because of the wealth it was producing from its mines, — the state of Nevada, admitted on October 31, 1864.
 

 Even assuming that the waters from the two springs were the headwaters of Little Dog creek prior to 1864, yet with the construction of the Hillis ditch they were entirely severed from the creek, and thereafter flowed into and along the ditch and had no other channel or outlet for a period of approximately 90 years (except for a short time at rock spring as above discussed). The situation is no different from what it would have been had the spring waters been cut off from Little Dog creek by some upheaval or other natural cause and found a new channel, instead of being cut off by artificial means. At the time this happened, there were no riparian owners to be affected, nor was there a water code, or any other circumstance to prohibit or interfere with the actions of the ditch builders. The federal government sanctioned such diversions and protected all rights accruing thereby. USCA, Title 30, §§51, 52;
 
 California Oregon Power Co. v. Beaver Portland Cement Co.,
 
 295 US 142, 55 S Ct 725, 79 L ed 1356. Also see
 
 Davis v. Chamberlain,
 
 51 Or 304, 98
 
 *43
 
 P 154. It is obvious that upon the construction of the Hillis ditch a new stream along said ditch was developed from the springs.
 

 This creation of a new stream was and is permanent, and no person has a right to now demand a restoration of conditions as they allegedly existed before Hillis ditch was constructed.
 
 Harrington v. Demaris,
 
 46 Or 111, 77 P 603, 82 P 14;
 
 Cottel v. Berry,
 
 42 Or 593, 72 P 584;
 
 Geddis v. Parrish,
 
 1 Wash 587, 21 P 314;
 
 Burk v. Simonson,
 
 104 Ind 173, 2 NE 309;
 
 Ford v. Whitlock,
 
 27 Vt 265;
 
 Woodbury v. Short,
 
 17 Vt 387.
 

 The two springs in question (rock spring and seep spring), and the waters therefrom, belong exclusively to the plaintiffs, except, of course, such portion of the waters as may naturally seep through the banks of Hillis ditch or find their way into Little Dog creek after use by plaintiffs for irrigation purposes. The plaintiffs are entitled to an injunction permanently enjoining and restraining defendants, and all persons acting by, through, or under defendants, from trespassing upon plaintiffs ’ lands, from injuring the Hillis ditch in any manner, and from interfering in any way with the flow of water from said two springs to and into the Hillis ditch, or its exclusive use by the plaintiffs.
 

 Only one question remains to be discussed; viz., that pertaining to the actual damages claimed by plaintiffs because of defendants ’ wrongful acts. After a careful review of the evidence upon this subject, we are of the opinion that it is too indefinite and speculative to warrant an allowance of such damages against defendants. In every case, actual damages sustained must be established by evidence upon which their existence and amount may be determined with reasonable certainty. Speculative damages are never allowed. The
 
 *44
 
 evidence in this case wholly fails to establish with any degree of certainty the existence or extent of the actual damages suffered by plaintiffs as the proximate result of defendants’ wrongful acts, as distinguished and separated from other concurrent causes of injury to plaintiffs not attributable to defendants’ conduct.
 
 Allen et ux. v. McCormick,
 
 193 Or 604, 612, 238 P2d 220.
 

 However, defendants were guilty of trespassing upon plaintiffs’ land, and although plaintiffs are not entitled to recover actual damages herein, nevertheless, they are entitled to recover nominal damages as a matter of law.
 
 Sleep v. Morrill,
 
 199 Or 128, 131, 260 P2d 487. In view of the repeated trespasses by defendants, each of which gave plaintiffs a right of action, we find that the sum of $100 is a reasonable sum to be allowed plaintiffs as nominal damages.
 

 The decree of the trial court is reversed and this cause is remanded with directions to enter a decree and judgment in favor of plaintiffs against the defendants in conformance with this opinion.
 

 Neither party shall recover costs and disbursements.