Argued June 8, affirmed July 14, 1966
## STATE OF OREGON *v.* WANDA DILLS
## STATE OF OREGON *v.* CHESTER LEON STICE
416 P. 2d 651

*Donald W. Monte,* Eugene, argued the cause and filed a brief for appellant in each case.

*John E. Moore,* Deputy District Attorney, Eugene, argued the cause for respondent in each case. With him on the briefs was William F. Frye, District Attorney, Eugene.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, HOLMAN and LUSK, Justices.

LUSK, J.

The defendants, Wanda Dills, and Chester Leon Stice, her son, were indicted separately for the crime of first degree arson, the unlawful setting of fire to and burning a dwelling house: ORS 164.020. By agreement they were tried together, were convicted, and have appealed.

Since the defendant Wanda Dills assigns error to the court's denial of her motion for a directed verdict of acquittal based on the ground that the sole evidence

of her guilt was furnished by an accomplice, it is necessary to set forth the evidence in some detail.

The accomplice is Carolyn (also referred to as Marilyn) Sergeant. She was a friend and close associate of the defendant Wanda Dills.

In May of 1964 Mrs. Dills and Mrs. Sergeant occupied adjoining apartments in a house in Glenwood, a suburb of Eugene, Oregon. As a witness for the state, Mrs. Sergeant testified that about May 21, 1964, she helped Mrs. Dills move her household effects and furnishings to a house on Coburg Road, located about four miles from downtown Eugene, which Mrs. Dills had rented from the owner, David Pruitt. This is the house that was burned. Mr. Pruitt's home was on adjoining property some fifty feet away from the rented house. The fire occurred in the early morning hours of May twenty-fourth. At the same time that Mrs. Dills moved from the Glenwood house Mrs. Sergeant also moved to a house in a place called Pleasant Hill in the Eugene area. On the afternoon before the fire she and Mrs. Dills "took a whole trailerload of stuff up and put it in the [Pleasant Hill] house and locked it up." The "stuff" referred to consisted of clothing and household furnishings and equipment belonging to Mrs. Dills which had previously been moved into the Coburg Road house, together with a lamp that belonged in the Coburg Road house and which Carolyn Sergeant admitted she stole. They removed this property because the house was to be set afire. In furtherance of this purpose, before going to Pleasant Hill they left an iron plugged in on an ironing board. Later, they returned to the Coburg Road house and found that the hot iron had scorched a dress left on the ironing board and the ironing board cover, but, as nothing had caught fire, Mrs. Sergeant ignited some

clothes hanging over the ironing board with a cigarette lighter, saying to Mrs. Dills she "thought that this would take." Mrs. Sergeant, Mrs. Dills and Stice then left in Mrs. Dills' car, driven by Stice, for a nightclub called "Bimbo's," located about midway between Eugene and Springfield. Stice dropped the other two off at Bimbo's, with the understanding that he would pick them up later. He returned about 2:30 a.m. In the meantime, however, Mrs. Dills had gone to the Coburg Road house (accompanied, as she testified, by a man named Donovan). On her return to Bimbo's she told Mrs. Sergeant that the house was full of smoke and she could not stay there. When Stice returned to Bimbo's the three of them drove to the Coburg Road house by a back road with the lights of the car out, and upon their arrival there Stice went into the house and came back to the car saying he had started the fire again. They thereupon drove to a restaurant called "Snappy's Service" in downtown Eugene. Looking back, they saw that the house was in flames. They were joined at Snappy's Service by Mrs. Dills' daughter, Glenda, and her girl friend, and had been there about an hour and a half when Steve Dooley—who had helped with the moving and was staying at the Coburg Road house—came by and said the house was on fire. They raced to the fire. By the time they got there the house was "completely enveloped." The Pruitt home had also caught fire, but the firemen had succeeded in putting it out.

Cecil Davis, a witness for the state, who had known Mrs. Dills and her son for about four years and is a cousin of Mrs. Dills' husband, brought his car and helped with the moving from the Glenwood house to the Coburg Road house. He testified:

"Q In moving in, do you recall an occasion

when a closet door was open and a discussion concerning the burning of that house took place?
"A Yes.

"Q Who was present?
"A There was me, and Wanda, and Marilyn.

"Q What was that conversation?
"A Well, Marilyn opened the door and said [sic] was looking through some old papers because the closet was full of old papers and stuff, and she said this would be a good place for a fire, and Wanda said, 'Yeah,' and so she said, 'I will give anybody five hundred to burn it.'

"And then she looked at me and says, 'Do you want the job?' And I said, 'Why yeah,' just joking, you know, and that was all that was said.

"Q Did you burn it?
"A No."

On cross-examination Davis testified that he thought Mrs. Sergeant was joking. His testimony continued:

"Q (By Mr. Monte) Did she have a joking manner?
"A Yeah.

"Q And was your answer in a joking manner?
"A Yes, sir, it was.

"Q Did the other people laugh about it too?
"A Well, as far as I know they did.

"Q Do you remember what—
"A I mean was just all joking around in the house.

"Q As a matter of fact, you were just investigating the house when you discovered these things, weren't you?
"A Well, no, I wasn't looking around in the house. I was putting up stuff, and Carolyn found them.

"Q  Carolyn found the papers?

"A  That lady back there (indicating).

"Q  What did she say when she found the papers?

"A  Well, she said that it would be a good place to start a fire.

"Q  She is the one that said that?

"A  Yeah.

"Q  And was it after this statement that Mrs. Dills said 'Yeah, I will give you five hundred dollars for someone to do it. Do you want the job?' Was it after this statement that she said that?

"A  Yeah.

"Q  Was there ever anything more said about that?

"A  No, sir, there wasn't.

"Q  Just dropped there, is that it?

"A  Yeah."

■■ Davis was not an accomplice. We think his evidence is sufficient to satisfy the requirement of ORS 136.550 that "[a] conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the crime." The defendant Dills would have us disregard the evidence because the words were uttered in jest, but the weight and effect of the evidence are matters committed to the determination of the jury, not the court: ORS 17.250. Arson is not ordinarily considered funny, and the jury might well have found that the "joking manner" to which Davis testified was of a kind that sometimes goes with a wicked or unlawful purpose.

There was other corroborating evidence, but, in view of Davis' testimony, it is unnecessary to set it forth.

The motion for a directed verdict was properly denied.

The other assignments of error relate to an incriminating statement made by defendant Stice to police officers, and recorded on tape. Both defendants, who were represented by the same counsel, objected to the admission of the statement, though the defendant Dills has a ground of objection in addition to that urged by her co-defendant.

The objection made on the trial common to both defendants was that the confession was involuntary because of an implied threat, that no *corpus delicti* had been established, and that the tape was not a clear and complete statement.

The objection on behalf of the defendant Dills alone was that the statement was not admissible as to her because there was no independent evidence of a conspiracy.

■ In the briefs, however, counsel for defendants has gone beyond the objections made below and has argued that Stice's Fifth and Sixth Amendment rights, as enunciated in *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L ed 2d 977, and *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482, were violated.[1] This case was tried in April, 1965, long after the decisions in the *Escobedo* and *Neely* cases, and, in accordance with the firmly established rule of appellate procedure, we decline to consider objections made for the first time in this court: *State v. Evans,* 241 Or 567, 407 P2d 621; *State v. Clifton,* 240 Or 378, 401 P2d 697. And

---

[1] This case is not governed by Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L ed 2d 694, since it was tried before the Miranda decision was rendered: Johnson v. New Jersey, 384 US 719, 86 S Ct 1772, 16 L ed 2d 882.

see *Schmerber v. California,* 384 US 757, 86 S Ct 1826, 16 L ed2d 908, Footnote 9.

On January 16, 1965, the defendant gave the statement in question under interrogation by State Police Officer Benninghoff, who was accompanied by State Police Officer Veteto. As stated, the interview was recorded on a tape, but the latter part of the recording was unintelligible, apparently due to a mechanical failure caused by the motor in a Coca-Cola dispensing machine on which the recorder rested. The court, having first listened to a playback of the record out of the presence of the jury, admitted in evidence the intelligible part of the tape, and Officer Benninghoff testified to the remainder of the statement.

The evidence shows without contradiction that before the statement was taken Stice was warned by the officers of his right to remain silent, that anything he said might be used against him, and of his right to an attorney, and that he expressed his willingness to proceed with the interrogation. Upon the conclusion of the statement he was placed under arrest, taken before a magistrate, who fixed his bail, and lodged in jail. No claim was made on the trial of any invasion of Stice's constitutional rights, other than that his statement was involuntary.

There was the usual preliminary hearing out of the presence of the jury to determine this question. Stice testified at this hearing and before the jury as well. He testified that the officers told him before interrogating him that they had a signed statement from his mother. This is the basis of his claim of an implied threat. The testimony was denied by Officer Benninghoff. He also claimed in his testimony that he made no statement about his own conduct on the night of the fire, but only recounted what he had heard

Carolyn Sergeant had been telling about him. The recorded statement refutes this claim, as did the testimony of the officers. The court made a formal finding that the confession was voluntary and in the charge submitted that question to the jury with appropriate instructions: *State v. Brewton*, 238 Or 590, 395 P2d 874. The jury evidently made the same finding as the judge. There is nothing in the record to warrant this court in disturbing their decision that the statement was voluntary.

■ The objection that there was no proof of the *corpus delicti* has already been shown to be without merit.

We come to the contention that the portion of the tape received in evidence was inadmissible because the remainder was unintelligible.

We have listened to a playback of the portion of the tape admitted in evidence. It is audible, clear, and distinct. In substance, Stice stated that when he drove his mother and Mrs. Sergeant to the Coburg Road house from Bimbo's he learned for the first time about the "iron on the ironing board" and Mrs. Dills asked him "to go in and see if the place was burning." He said: "I didn't want to do it" and there the recording ends. The remainder of the statement was testified to by Officer Benninghoff. He asked Stice: "What did you do?" and Stice answered: "Well, I went in the house, and the fire was burning on some clothing over the ironing board, and I fanned it, and it started up to burn * * * and I came outside and told my mother that it was burning in two places. And then we drove down the road and looked back at this house and it was all in flames then." They drove to Snappy's Service, where they met Glenda and her girl friend,

and, as they were about to leave, a friend came by and told them about the fire and they all drove back to the scene of the fire and found the house burned down.

█ It is a general rule that a witness may testify to parts of a conversation that he heard and understood, though the remainder was inaudible: 58 Am Jur 91, Witnesses § 114. The rule has been applied in a number of cases to confessions partly heard by a witness: 20 Am Jur 452, Evidence § 531; cases reviewed in Annotation, 2 ALR 1017 at 1030. It has been applied also where a confession was recorded and the recording was partially unintelligible. See Annotation, 58 ALR2d 1024, 1038.

Thus, in *United States v. Schanerman,* 150 F2d 941 (3d Cir) the court said:

"* * * the mere fact that certain portions of the mechanically recorded conversations were less audible than others did not call for exclusion of what the jurors personally heard from the 'playing' of the records. There would be no more valid reason for exclusion of the mechanically recorded conversations than there would be for excluding competent conversations, overheard in part, by human witnesses." 150 F2d at 944.

Again, in *Monroe v. United States,* 98 App DC 228, 234, 234 F2d 49, cert den 352 US 873, 1 L ed 2d 76, 77 S Ct 94, the court said:

"Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge. This is especially so when the witness who heard the statements recorded also testifies, so that the recordings give independent support to his testimony."

Other decisions to the same effect are cited in the margin.[2]

■ These authorities, as well as common sense, support the ruling of the court which permitted the mechanical witness and the human witness, together, to relate to the jury the statement of the defendant Stice in its entirety.

It may be added that there is no claim that the tape was tampered with.

■ Finally, the contention of the defendant Dills that Stice's statement was not admissible against her because there was no evidence of a conspiracy, cannot be sustained, for it is contrary to the record. The testimony of Carolyn Sergeant establishes a conspiracy between her and Dills to commit arson to which Stice became a party, if not before, at least at the time he drove Dills and Sergeant to the Coburg Road house from Bimbo's. *State v. Parker,* 225 Or 88, 356 P2d 88, cited by the defendant Dills, is not in point because the facts were wholly different. That case does, however, recognize the rule that slight evidence is sufficient to prove a conspiracy: 225 Or at 92.

■ It would have been a proper objection to the admissibility of the Stice statement as against Dills that it was made long after the conspiracy had come to an end,[3] but no such ground of objection was stated on the trial or is urged in this court, and the state-

---

[2] People v. Porter, 105 Cal App 2d 324, 331, 233 P2d 102; People v. Jackson, 125 Cal App 2d 776, 271 P2d 196; People v. Curtis, 134 Cal App 2d 624, 286 P2d 446; State v. Salle, 34 Wash 2d 183, 208 P2d 872; State v. Slater, 36 Wash 2d 357, 218 P2d 329; State v. Lyskoski, 47 Wash 2d 102, 287 P2d 114.

[3] The court instructed the jury in accordance with this rule. The instruction was not applicable to the evidence, but no exception was taken to it.

ment, like any other hearsay evidence not objected to, had probative value: *Gardner v. Dollina and Elliott et al,* 206 Or 1, 6, 288 P2d 796.

The evidence of guilt in this case was strong. It discloses two unsuccessful attempts to burn a dwelling house and a third successful attempt. It discloses, also, a motive for the crime. The defendant Dills' personal property was covered by a policy of fire insurance in the amount of $5,000. She submitted a proof of loss to the insurance company which included claims that the jury could have found false and fraudulent.

The defendants received a fair trial. There is no reversible error and the judgments are affirmed.