Argued June 5, affirmed December 6, 1967

## STATE OF OREGON, *Respondent, v.* JACK R. ALLEN, *Appellant.*

434 P. 2d 740

*Donald Hansen,* Medford, argued the cause and filed briefs for appellant.

*Lee S. Werdell,* Deputy District Attorney, Medford, argued the cause for respondent. With him on the brief was Thomas J. Owens, District Attorney, Medford.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE, HOLMAN and LUSK, Justices.

McALLISTER, J.

This is the second appeal of this case. The defendant Jack R. Allen, was convicted of burglary in Jackson county on July 29, 1963, and appealed to this court. The conviction was set aside and the case remanded for a new trial. *State v. Allen,* 239 Or 524, 398 P2d 477 (1965). Allen was again convicted, and now appeals from his sentence of eight years imprisonment in the penitentiary. His brief contains numerous assignments of error, most of which involve the admissibility of the same written confession involved in the prior appeal.

Unlike the prior appeal, there is surprisingly little dispute about the controlling facts. On Sunday morning, March 24, 1963, at about 9:00 o'clock, Allen was driving south on Interstate 5 immediately north of Grants Pass. Allen's wife, Rosemary, and his brother-in-law, Melvin Snodgrass, were riding with defendant. The car was stopped by Officer Birge of the Oregon State Police, who was acting in response to a teletype advising that Allen was wanted by authorities in Medford, and that his vehicle "was wanted in connection with burglaries," both in Jackson county and in Washington. The officer asked Allen for his driver's license

and Allen produced a Washington operator's license. In compliance with the request of the officer, Allen opened the trunk of the car and the officer saw therein a small sledge hammer, a Polaroid camera, and some rolls of coins in the camera case. The officer then talked further with Allen about his driver's license and learned that Allen had been living in the Ashland area and had been employed by Bear Creek Orchards for over a month. The officer then told Allen he was under arrest "for not having an Oregon operator's license." The officer testified that with their consent he then gave both Allen and Snodgrass a "pat-down" search.

In the meantime, State Police Officer Schneider, who had been summoned by radio, arrived on the scene. Officer Birge then asked Rosemary Allen and Snodgrass "if they would mind" going to the Grants Pass office of the Oregon State Police, because "we wanted to talk with them some more so we could straighten this out." The group then proceeded to the state police office, which was nearby. Allen, who was under arrest, rode with Officer Birge, Rosemary Allen rode with Officer Schneider, and Snodgrass drove Allen's car. Officer Birge at the office got from Allen further information needed to fill out a complaint "for no operator's license" and talked to Allen about "the camera that was in his trunk." After talking for a while Allen said he would like to see an attorney and according to the officer, "we stopped right there." A telephone call was placed to the justice of the peace at Grants Pass, who fixed Allen's bail on the traffic charge at $100. Allen was taken to the Josephine county jail at 10:10 a.m., about an hour after he was stopped on the highway.

There is a conflict in the testimony as to whether

defendant tried to post bail on the traffic charge. The officers testified that defendant made no attempt to post bail whatever and that they were not authorized to accept bail. Defendant testified that when informed that his bail had been set at $100, he asked his wife to give the officers $100 from funds in her possession, but the officers refused to let her post bail and hustled him off to jail. It does appear that about $300 in Mrs. Allen's possession, much of it in coins and small bills, was held as evidence.

The next morning, Monday, March 25, Allen was interviewed in the jail by Sherman Smith, a Grants Pass attorney, and the two conferred again in a corridor of the courthouse immediately adjacent to the courtroom of the justice of the peace. Allén did not appear before the judge, but a plea of not guilty to the traffic charge was entered on his behalf by his attorney. Smith was retained to represent Allen on the traffic charge, but according to Smith, during his interview with Allen "there was mention made of a felony warrant pending in Jackson county." After his visit to the courthouse Allen was returned to the jail and remained there until he was picked up late Monday afternoon by a deputy sheriff from Jackson county.

In the meantime, on Sunday, March 24, both Rosemary Allen and Snodgrass had been picked up at the state police office in Grants Pass and taken to Medford by officers from Jackson county. The record concerning these two is incomplete, but it appears that on Monday, March 25, Mrs. Allen was being held in the Jackson county jail on a charge of receiving and concealing stolen property. It also appears that on March 25, Snodgrass was being held in the Jackson county jail on a charge of burglary not in a dwelling,

committed by breaking and entering the office of the Jeddeloh Bros. Sweed Mill, Inc., in Gold Hill. It further appears that on either Sunday or Monday, Snodgrass had confessed to the crime and implicated defendant Allen therein.

During the afternoon of Monday, March 25, a warrant for Allen's arrest was issued by the district court for Jackson county. The warrant was based on a complaint charging Allen with the burglary of the Jeddeloh office. A deputy sheriff from Jackson county took Allen from the jail in Grants Pass at 5:35 p.m., and brought him to the jail in the Jackson county courthouse at Medford.

Deputy Sheriff Bjorensen was at the Jackson county jail when Allen arrived and took Allen to an interrogation room and talked to him. The officer testified that he informed Allen that he had a right to counsel, that he did not have to say anything, and that anything he said could be used against him. Allen was reluctant to talk, and the officer told Allen that Snodgrass had given a statement. Allen asked to talk to Snodgrass and Snodgrass was brought to the room. Allen asked Snodgrass whether he had given a statement and received an affirmative reply. Allen then gave a statement to Deputy Sheriffs Bjorensen and DeBerry, admitting his complicity in the Jeddeloh burglary, as well as numerous other burglaries, including one in Baker county involved in State v. Allen, 241 Or 95, 404 P2d 207 (1965). Defendant's interrogation and the preparation and signing of his statement were concluded in about an hour and a half. Defendant was taken before a magistrate in the district court for Jackson county on Tuesday morning, March 26, 1963.

There is a conflict in the evidence concerning alleged coercion of Allen during his interrogation in the

Jackson county jail. According to defendant the officers promised to release his wife if he confessed and threatened that he would be prosecuted for numerous burglaries if he did not. Defendant's charges of coercion were denied by the officers.

Allen testified at the *in camera* hearing on the voluntariness of his confession. His testimony was contradictory and equivocal, but in part directly corroborated the testimony of Officer Bjorensen that Allen had been informed of his constitutional rights. Allen testified in part as follows:

"Q. Now, Mr. Allen, when you were up in the Jackson County Jail talking to these officers—I mean Officer Bjorensen and Dean DeBerry—you knew that you didn't have to talk to them unless you wanted to, did you?

"A. Yes.

\* \* \* \* \*

"Q. Right. And you say that you asked about an attorney as soon as you went into the interrogation room?

"A. As soon as I found out for sure what the charge was, yes, I asked for an attorney.

"Q. That wasn't what I asked you, though, Mr. Allen. Did you ask about an attorney as soon as you entered the interrogation room?

"A. Yes, I did.

"Q. So you knew at that time you had a right to an attorney, didn't you?

"A. Yes.

\* \* \* \* \*

"Q. You acknowledge, don't you, that while the officers were talking to you upstairs that they told you that if you didn't have money for an attorney that you'd get one appointed for you when you went before a magistrate. You acknowledge that, don't you?

"A. Yes.

"Q. And that was before you made this statement, wasn't it?

"A. I don't remember.

"Q. Would you say it could have been?

"A. Yes, it could have been, I imagine."

■■ The trial court found that Allen's confession was given voluntarily and after he was advised of his constitutional rights, as required by our decision in *State v. Neely*, 239 Or 487, 395 P2d 557, 398 P2d 482 (1965).[1] We have carefully reviewed the record and concur with the findings of the trial court.

■ Although defendant's assignments of error are imprecise, he does contend that his confession was inadmissible because it was the product of an illegal arrest. ORS 482.300 (2) requires a licensed operator to have his license in his immediate possession at all times while driving a motor vehicle, and to display it upon demand of a peace officer.[2] Whether this authority to stop a motorist to inspect his operator's license may be used as a pretext to stop the motorist for another purpose need not be decided in this case.

We are not concerned with the legality of the search of the trunk of defendant's automobile, which according to the police was consented to by defendant. Nothing observed during the search or later taken from the vehicle was received in evidence at defendant's trial.

---

[1] Since the retrial of this case began before Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 LEd2d 694, 10 ALR3d 974 (1966), was decided, the principles relating to police interrogation announced in that case are not applicable here. Johnson v. New Jersey, 384 US 719, 86 S Ct 1772, 16 LEd2d 882 (1966); State v. Dills; Stice, 244 Or 188, 194, 416 P2d 651 (1966).

[2] ORS 482.300 "(2) The licensee shall have such license in his immediate possession at all times when driving a motor vehicle, and shall display it upon the demand of a justice of the peace, a peace officer, or a field deputy or inspector of the department. * * *"

Putting aside the question of motivation, which will be discussed later, we find nothing illegal about defendant's arrest for violation of the traffic code. ORS 482.040 provides that no person, except those expressly exempted by statute, shall drive any motor vehicle in this state unless he has been licensed as an operator. A non-resident who has been duly licensed in his home state is expressly exempted by ORS 482.050. When Officer Birge learned that defendant was living and working in Oregon he had at least prima facie evidence that defendant was a resident of Oregon and consequently violating ORS 482.040 by not having an Oregon operator's license. The arrest of defendant was authorized when the officer concluded that defendant had committed a crime in his presence. ORS 133.310 (1). The comprehensive code dealing with traffic offenses also expressly authorizes a police officer to arrest a person for a traffic offense. ORS 484.100 (1).[9] Officer Birge decided to arrest, and defendant's incarceration in the Josephine county jail followed as a matter of course. Although defendant retained an attorney and consulted with him, no application was made to the magistrate for defendant's release on bail. A plea of not guilty was entered for defendant by his attorney and the case was set for trial on Wednesday, March 27. Prior to the time fixed for trial on the traffic charge defendant had been arrested on the felony warrant.

It is obvious from the record that the police were

---

[9] ORS 484.100 "(1) A police officer may arrest or issue a citation to a person for a traffic offense at any place within the jurisdictional authority of the governmental unit by which he is authorized to act."

As effective when defendant was arrested, the above statute provided only for arrest. As amended by ch 401, Oregon Laws 1963, § 1, effective September 2, 1963, the statute authorized the police officer to either arrest or issue a citation.

primarily interested in the defendant as a burglary suspect and that the traffic charge was used to obtain some measure of control over the defendant while the burglary investigation proceeded. The traffic charge served the purpose of keeping defendant in custody until Monday afternoon, March 25, when he was arrested for burglary and taken to Medford.

There is no contention by defendant, however, that during the approximately 32 hours he was held in the jail at Grants Pass he was subjected to any interrogation or any coercion of any kind. Defendant had consulted, both in the jail and in the courthouse, with an attorney retained by him. Defendant's own testimony establishes that he was not interrogated about the burglary charge until he had been arrested on the burglary warrant and taken to Medford, where before interrogation he was advised of his rights.

There is no evidence of any causal connection between defendant's arrest on the traffic charge and his subsequent admissions made at Medford concerning the burglary. The trial court did not err in admitting Allen's confession into evidence and in denying his motion for a judgment of acquittal.

We find no merit in the other assignments of error, most of which were not raised in the trial court.

The judgment is affirmed.

SLOAN, J., dissenting.

It seems clear in this case that defendant was pressed by interrogation after he had asked for an attorney and after he had said he did not want to talk. Therefore, for the reasons stated in the dissents of Justice DENECKE in *State v. Atherton,* 1966, 242 Or 621, 629, 410 P2d 208, and in *State v. Rosenburger,*

1966, 242 Or 376, 380, 409 P2d 684, and in his specially concurring opinion in *State v. Beaver,* 1967, 248 Or 101, 432 P2d 509, I think the confession was inadmissible and the case should be reversed.

DENECKE, J., joins in this dissent.


O'CONNELL, J., dissenting.

We have here another instance of a common police practice in which the officer, not having probable cause to arrest, search and detain a person for the commission of a crime, uses the pretext of arresting him for a minor traffic violation in order to obtain evidence or a confession sufficient to charge him with the suspected crime.[1]

I shall assume for the purpose of considering this case that the police officer had the authority to stop the defendant on the highway and to require him to exhibit his operator's license.[2] I shall also assume that the search was lawful on the ground that the defendant consented to it, although it is doubtful whether the facts are sufficient to sustain the search on this basis.[3]

After the search was made, the officer had to decide whether he was going to arrest and hold defendant on the charge of burglary or on the charge of violating

---

[1] La Fave, Arrest—The Decision to Take a Suspect into Custody 187 (1965).

[2] While it is generally conceded that police may at any time stop the driver of an automobile for the purpose of examining his driver's license, authorities disagree as to the lawfulness of this practice when police have an ulterior motive in requiring the motorist to stop and exhibit his license. Compare Cox v. Tennessee, 181 Tenn 344, 181 SW2d 338, 154 ALR 809 (1944) with Cameron v. State, 112 So2d 864, 868 (Fla 1959).

[3] See People v. Zeigler, 358 Mich 355, 364, 100 NW2d 456, 461 (1960).

the traffic regulations. If the arrest was properly made upon the basis of the former charge, the conduct of the police following the arrest did not result in the violation of defendant's constitutional rights.

But the officer did not arrest defendant on the burglary charge; he elected to charge defendant with a minor traffic violation in "not having an Oregon operator's license."

A violation of a minor traffic regulation does not subject a person in this state to the machinery of the criminal law. The Oregon statutes make this eminently clear. The statutes on arrest (ORS 133.310) and on traffic offense procedures (ORS 484.010 et seq.) distinguish between a "major traffic offense" and other traffic violations.[4] Thus, ORS 133.310 provides that "[a] peace officer may arrest a person without a warrant * * * (3) [w]hen a felony has in fact been committed *or a major traffic offense,* as defined in subsection (3) of ORS 484.010 * * *."[5] (Emphasis supplied.)

---

[4] ORS 484.010 (5) defines a major traffic offense as follows:

"(5) 'Major traffic offense' means a violation of any of the following provisions of law or a city ordinance conforming thereto:

"(a) Reckless driving, as defined in subsection (1) of ORS 483.992.

"(b) Driving while under the influence of intoxicating liquor, barbiturates or narcotic drugs, as defined in subsection (2) of ORS 483.992.

"(c) Failure to perform the duties of a driver involved in an accident or collision, as defined in subsections (1) and (2) of ORS 483.602 and ORS 483.604, which would be punishable under subsection (1) of ORS 483.990.

"(d) Operating a motor vehicle while the operator's or chauffeur's license is suspended or revoked, as defined in ORS 482.650.

"(e) Fleeing or attempting to elude a traffic or police officer, as defined in subsection (1) of ORS 483.049."

[5] Prior to the amendment in 1963 (Ch 448, Oregon Laws 1963), ORS 133.310 did not authorize an arrest without a warrant for the major traffic offense.

More to the point is ORS 484.150, which requires appearance in court in case of a major traffic offense but permits the violator of any other traffic offense to sign a plea of guilty on the traffic summons, mail it to the court together with a check or money order in the amount of the "bail" and thus avoid the necessity of appearing in court. There is nothing in the statute to indicate that this privilege to pay the traffic fine and proceed on one's way was intended to be limited to persons who are free from police suspicion. ORS 484.120 authorizes an officer to take security for the appearance of a person arrested for a traffic offense, "if it appears to the officer that the arrested person might fail to appear in response to a citation * * *." But this statute should be construed to mean that security can be demanded only in those cases in which the legislature deemed it important that the violator be present in court, i.e., when there is a major traffic offense; not when the only purpose that could be served by the appearance would be the collection of a fine. If the police can keep a person in custody for the violation of a minor traffic offense while they look for evidence to establish his guilt, the requirement that an arrest and search be based upon probable cause would be meaningless because there would be few, if any, instances when the police, suspecting the driver of having committed a crime, could not charge him with the violation of a minor traffic violation.

In the present case it is patent that defendant was kept in custody for the purpose of giving the police time to gather evidence of his guilt. While he was in custody, his companion Snodgrass was interrogated and finally confessed to the burglary. The police then informed defendant of Snodgrass' confession, whereupon defendant asked to see Snodgrass to verify the

reported confession and when defendant learned that the report was true he confessed. Thus the detention could have been a substantial factor in obtaining defendant's confession.

Since the arrest and detention was unlawful, defendant's confession which was a product of it should not have been received in evidence.[©]

DENECKE, J., dissenting.

I further dissent from a statement made in a footnote in the majority opinion which states "* * * the principles relating to police interrogation announced in that case [*Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L ed2d 694, 10 ALR3d 974 (1966)] are not applicable here. *Johnson v. New Jersey,* 384 US 719, 86 S Ct 1772, 16 Led2d 882 (1966); * * *."

That statement is, at least in part, patently incorrect. Two of the basic "principles relating to police interrogation announced" in *Miranda* were "[p]rior to any questioning, the person must be warned that he has a right to remain silent * * * and that he has a right to the presence of an attorney * * *." 384 US at 444. We anticipated these principles by our decision in *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482 (1965), and the majority has applied them in this case.

Two other principles of police interrogation announced in *Miranda* are that if the suspect indicates that "he wishes to consult with an attorney before speaking" or that "he does not wish to be interrogated, the police may not question him." 384 US at 445. This is simply a rule enforcing the rights about which the suspect has been warned and which he desires to

---

[©] Wong Sun v. United States, 371 US 471, 83 S Ct 407, 9 Led2d 441 (1961).

exercise. These appear to be the principles to which the majority refers. In my opinion these last two "principles" are ancillary and clearly follow from our decision in *State v. Neely,* supra. The latter ground was the basis for my dissents in *State v. Atherton,* 242 Or 621, 629, 410 P2d 208, cert den 384 US 1025, 86 S Ct 1982, 16 L ed2d 1030 (1966), and *State v. Rosenburger,* 242 Or 376, 380, 409 P2d 684 (1966). Because of our prior decision in *State v. Neely,* supra, *Miranda* did not decide anything startlingly new which would disrupt law enforcement and the administration of justice in Oregon and, therefore, there is no reason to adopt the retroactivity rule announced in *Johnson v. New Jersey,* 384 US 719, 86 S Ct 1772, 16 L ed2d 882 (1966).

*Johnson v. New Jersey,* supra (384 US 719), upon which the majority relies, I construe as supporting the adoption of my position for a jurisdiction such as Oregon:

"Because *Escobedo* is to be applied prospectively, this holding is available only to persons whose trials began after June 22, 1964, the date on which *Escobedo* was decided.

"As for the standards laid down one week ago in *Miranda,* if we were persuaded that they had been fully anticipated by the holding in *Escobedo,* we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of *Escobedo*,[®] however, have impelled

"[®] For example, compare *People v. Dorado,* 62 Cal. 2d 338, 42 Cal. Rptr. 169, 398 P 2d 361 (1965), and *People v. Dufour,* 99 R.I. 120, 206 A 2d 82 (1965), which construe *Escobedo* broadly, with *People v. Hartgraves,* 31 Ill. 2d 375, 202 N.E. 2d 33 (1964), and *Browne v. State,* 24 Wis. 2d 491, 131 N.W. 2d 169 (1964)." 384 US at 734.

us to lay down additional guidelines for situations not presented by that case. This we have done in *Miranda,* and these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966. * * *

*People v. Dorado,* 62 Cal2d 338, 42 Cal Rptr 169, 398 P2d 361 (1965), cited in the footnote as construing *Escobedo* broadly, is legally identical to *State v. Neely,* supra (239 Or 487).

*People v. Rollins,* 65 Cal2d 681, 56 Cal Rptr 293, 423 P2d 221 (1967), is contrary to my position