Argued February 6, affirmed March 27, petition for
rehearing denied April 16, 1968

STATE OF OREGON, *Respondent, v.*
ROBERT WESLEY BAKER, Sr.,
*Appellant.*
438 P. 2d 978

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for appellant.

*Gary D. Gortmaker,* District Attorney, Salem, argued the cause and filed the brief for respondent.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL and LANGTRY, Justices.

## LANGTRY, J. (Pro Tempore).

Defendant was convicted of receiving and concealing 506 pounds of stolen copper wire. An equal amount of copper wire was cut and stolen from Southern Pacific railway right-of-way between Salem and Turner in Marion County some time during the night of November 27-28, 1966. This was a country area. Two of three officers testifying said they saw defendant and his brother-in-law on November 28, 1966, shortly after midnight, walking in the area between the highway and the railroad right-of-way, which were parallel. The brother-in-law's wife was repeatedly seen by two of the officers driving an automobile slowly around the same area at that time. Not more than an hour after the last of these sightings an officer drove up to defendant's home located a few miles away. From the roadway he saw the same three persons standing around the vehicle the woman had been driving and defendant's pickup truck. The officer testified all lights were out: "I pulled up and one person was behind—I should say in the rear of the Plymouth and it sounded to me like there was wire being dropped

out of it." He testified the defendant refused the officer permission to come on the property without a search warrant. On recross and redirect examination the following was elicited:

"Q  Mr. Gortmaker asked you about when you heard them unloading wire. You didn't hear them unloading wire; you said you heard something that sounded like it?

"A  That's right.

"Q  You don't know whether it was wire or anything else, do you?

"A  No, sir.

"Q  That's all.

"MR. GORTMAKER: What did it sound like, Officer McCoy?

"A  It sounded like wire."

After a search warrant was obtained the officers took a black painted extension ladder from defendant's home. Its base, by measurement, fit perfectly ladder base marks at one of the poles from which wire had been cut, and it extended to the height where the cut had been made. Mud on the ladder's base tested exactly the same as mud from the marks at the base of the pole. The area where this all occurred was definitely identified in evidence as being in Marion County. After arrest defendant was questioned by an officer and denied theft of the wire. However, he admitted going with the same brother-in-law and wife to Portland the following day, by way of Salem, to sell 506 pounds of copper wire. He told the officer he suspected it was stolen. A Portland junk dealer testified to such a purchase. The wire was not produced. The purchaser testified of possibly 75 purchases of copper wire made from different people that day. He knew

all three persons involved here, and identified, by use of written records, the purchase of wire from the brother-in-law on November 28, 1966. He remembered all three as being together on that occasion.

Defendant alleges error in that the court should have: (1) on its own motion excluded defendant's statements to the officer when defendant's counsel did not object to them; and (2) allowed a motion for acquittal for lack of proof of the crime, and insufficient identification of the stolen copper wire.

During the *in camera* hearing to determine admissibility of defendant's statements, the officer stated his warning to defendant was:

"Q Did you advise him of his constitutional rights?

"A Yes, I did.

"Q What did you tell him?

"A I told him that he had the right to an attorney and that he had the right to remain silent and anything he said could be used against him in a court of law and that an attorney would be furnished him at the State's expense if he couldn't afford an attorney and any statement he did give would have to be willing and voluntary."

Before the jury the officer varied this to the following:

"A I told him that he had the right to remain absolutely silent, and that anything he said would be used against him in a court of law, and anything he said had to be free and voluntary, and he had the right to have an attorney present when he made a statement or any time he wished to make a statement, and if he didn't have funds for an attorney the State would provide one."

The transcript discloses defendant was represented by a knowledgeable and aggressive attorney. He did not, after hearing the evidence produced in the *in camera* hearing, object to the testimony in the nature of admissions. It is obvious he believed the officer had adequately advised defendant of his rights before he made any admissions. The court asked him if he wanted to produce the defendant or others to testify about the adequacy of the warning and he did not.

The trial court reasonably concluded that the defendant was fully warned of his *Miranda* (*Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed2d 694, 10 ALR 3d 974 (1966)) rights by the officer, and that he was not coerced. It also is a reasonable conclusion from the transcript that the defendant understood his *Miranda* rights.

■ "We decline to consider objections made for the first time in this court." This is the rule applied with reference to *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964) and *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482 (1965), in *State v. Dills; Stice,* 244 Or 188, 416 P2d 651 (1966). In that case the trial occurred long after the *Escobedo* and *Neely* decisions. The same rule applies here, the only difference being that this case was heard long after *Miranda v. Arizona,* supra.

The gist of defendant's second assignment of error is that there is insufficient evidence: (1) of the corpus delicti, and (2) placing the wire in defendant's possession in Marion County.

■ In support of (1), defendant cites *State v. Oster,* 232 Or 396, 403, 376 P2d 87 (1962), where Mr. Justice Lusk said: The larceny rule is "* * * that identification of property found in the possession of the accused as that stolen in the theft * * * charged

must be by the most direct and positive testimony of which the case is susceptible * * *." This rule is of small comfort to defendant here. The wire was not "found" in defendant's possession. It was fungible goods that had been sold to a junk dealer within a few hours after the theft. He said he bought similar goods from about 75 people that day. The state produced evidence of purchase by the junk dealer of approximately the same amount of copper wire that had been stolen the night before. The same three people were together when it was offered for sale. They had repeatedly been seen—and they were the only people seen—in the area while the theft was occurring. This was "the most direct and positive testimony of which the case is susceptible."

The court is not overlooking that the junk dealer was questioned at length about whether he could describe the particular wire he bought. His knowledge was at best conjecture. He had no specific memory about this 506 pounds of wire, and his record was indefinite as to its appearance. The corpus delicti may be proved by circumstantial evidence. See *State v. Hancock,* 247 Or 21, 426 P2d 872 (1967); *State v. Walker,* 244 Or 404, 410, 417 P2d 1004 (1966). Sufficiency of evidence is a question for the jury under proper instructions. See 52 CJS 988, Larceny § 140.

In support of (2), defendant argues that he cannot be found guilty of concealing the stolen property on account of his admissions concerning the trip to Portland during the day following the theft. The charge of the indictment, the evidence, and the instructions include not only this period of time, but also all of the previous night. A plethora of circumstantial evidence was produced to justify the inference defendant joined with the others in concealing the wire during

the night. (And also that he joined them in stealing it.)

■■ There was direct evidence of concealment in the incident in the yard of defendant's home, as testified by the officer. Direct evidence includes what is heard as well as what is seen; indeed, what is perceived by the senses. Without looking to defendant's admissions about riding with his relatives to Portland to sell wire, there was evidence from which the jury could find guilt.

Judgment is affirmed.