Argued February 7, affirmed June 5, 1979

# STATE OF OREGON, *Respondent,*
*v.*
# MICHAEL ANTHONY TUCKER, *Petitioner.*
## (TC C 77-04-04696, CA 8748, SC 25963)

595 P2d 1364

Marianne (Oswald) Bottini, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Walter L. Barrie, Solicitor General, Salem, argued the cause and filed the brief for respondent. With him on the brief was James A. Redden, Attorney General, Salem.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, Lent and Linde, Justices.

TONGUE, J.

**TONGUE, J.**

Defendant was found guilty of burglary and theft. He appealed, contending that his motion to suppress evidence should have been granted. The Court of Appeals affirmed. 34 Or App 203, 578 P2d 803 (1978). We granted review in this case to consider the permissible scope of police activity in connection with traffic violations. Defendant has contended that a stop for a traffic violation was a subterfuge or pretext used by a police officer to create an opportunity for investigation of his suspicion of other crimes.

In this case we are concerned with two problems. The first is whether a police officer may stop and detain a traffic violator when his decision to do so is based on, or influenced by, a suspicion of criminal activity and that suspicion is based on circumstances which would not justify an investigative stop under ORS 131.615(1).[1] The second problem involves the circumstances under which an officer may take a traffic violator into custody after an authorized traffic stop.

*The facts.*

In this case the defendant and a companion were observed by two Portland police officers while the officers were on routine patrol duty in their car at about 10:00 a.m. Defendant and his companion were riding bicycles. Defendant was carrying, on his handlebars, a laundry basket containing an object partially covered by a blanket. The officers noticed that the rear tire on one of the bicycles was somewhat flat. It appeared to the two officers that the bicyclists noticed the marked patrol car, and that when they did so they changed their direction of travel. The officers then saw the two bicyclists ride through a stop sign without

---

[1] ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

[487]

stopping. The officers then signalled defendant and his companion to stop.

The trial court found as a fact that the officers' purpose in making the stop was to cite or arrest for the traffic violation. However, both officers testified, and the trial court made no finding to the contrary, that their reason for deciding to stop these two bicyclists for that purpose was that there was something suspicious or "out of the ordinary" about their appearance and behavior. The officers' conduct during the stop makes it clear that they were not solely concerned with the stop sign violation.

Officer Bell first asked defendant what he was carrying in the basket on his handlebars. Defendant showed him a television set in the basket. He told the officers that he had purchased the set for $75 about a month earlier. When the officers asked where they had been and where they were going, defendant and his companion gave answers that were inconsistent with their direction of travel at the time they were stopped.

Although the exact sequence of events is not clear, at some time during the questioning at the scene of the stop the officers obtained the serial numbers of the television and the two bicycles and checked by radio to determine whether they had been reported stolen. They had not. The officers also called other patrol cars in the area by radio to determine whether any burglaries had been reported. They learned of none.[2]

---

[2] Also during the questioning—again, the exact sequence is not clear— one of the officers noticed a bulge in defendant's companion's shirt pocket, which turned out to be a switchblade knife. The companion was then arrested for possession of the knife and was searched. A tire iron bearing paint marks was found concealed in the leg of his trousers and he was also found to be carrying a bank money bag containing change and some items of jewelry. The state contends that these discoveries, together with other circumstances which we have mentioned, provided an independent basis for taking the defendant into custody for further investigation of the possibility that he was involved in criminal activity. Because of the grounds on which we decide this case, we need not pass upon this contention.

Officer Bell, after he learned that defendant was carrying a television set, asked defendant his name and date of birth. Defendant answered that his name was Bobby Davis and that his date of birth was October 7, 1959. However, defendant's companion, when asked what defendant's name was, replied that it was Michael Tucker. Defendant, when asked by the officers, denied that his name was Michael Tucker. In response to further questioning, he also gave two different dates of birth, neither of which was October 7, 1959.

Defendant was then "arrested" for running a stop sign, a Class B traffic infraction whether committed in a motor vehicle or on a bicycle. ORS 487.120, 487.750. He and his companion were taken to the police detectives' office, where Officer Bell issued a traffic citation showing defendant's correct name and address. The record does not show at what time they arrived or when the citation was written. Defendant was, however, still in custody at about 12:30 p.m. when the police received information that the television set, the two bicycles, and other articles had been taken in a burglary that morning. At some time prior to 12:30 a police officer had spoken to defendant's mother at his home, obtaining information tending to confirm his identity as Michael Tucker. While detained at the station, defendant admitted that was his name.

Defendant was charged with burglary and theft of the television and a bicycle. He moved to suppress "all evidence, oral or tangible, obtained from the defendant" on the ground that both the initial stop and the custodial arrest were improper. The evidence which was the intended subject of the motion appears to consist of the false and evasive statements made by defendant during the stop at the scene, as well as the television set and bicycle which were seized when he was taken into custody. The motion was denied and defendant was found guilty upon an oral stipulation "to the facts sufficient for the court to enter a finding of guilty" on the burglary and theft charges.

[489]

*The officers were authorized to stop defendant after seeing him commit a traffic violation.*

Defendant and the Court of Appeals have characterized the stop in this case as a "pretext" stop. We have used that term in the past, although without defining its meaning.

In *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974), we reexamined the question of the permissible scope of a search of the person incident to a custodial arrest in light of the then recent decision of the United States Supreme Court in *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973). In *Florance* we held (at 182-84) that Article I, § 9 of the Oregon Constitution[3] should not be construed to place greater restrictions on searches incident to arrests than does the Fourth Amendment to the Constitution of the United States as interpreted in *Robinson.* We overruled our prior decisions which placed greater limitations on such searches than did the *Robinson* rule.

The present case does not involve the validity of a search, and the *Robinson* rule itself, as adopted in *Florance,* has no application. However, in our opinion in *Florance* we indicated that further refinement might be required in a case involving what we described as a "pretext" arrest.[4]

_____
[3] Article I, § 9 of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[4]
"It also appears from the concurring opinion of Stewart, J., in the companion case of Gustafson v. Florida, *supra,* (38 L Ed 2d at 462), that a different result might well also follow if such a search were made after a so-called 'pretext arrest' for the violation of a minor traffic ordinance. Concern over possible abuses by application of the *Robinson* rule to 'pretext arrests' is also expressed by the dissenting opinion in this case." 270 Or at 187.

"We do not sanction * * * 'pretext' arrests. * * * These possibilities, however, including the possibility that some police officers, by 'pretext'

As the dissent in *Florance* pointed out, we did not undertake in that case to define a "pretext" arrest. There was no need to do so in *Florance.* We also see no need to define a "pretext" stop in this case. To attempt to define the term would suggest that it has independent legal significance and would invite the difficulties which attend the creation and labeling of a legal category.[5] We prefer simply to turn our attention to the factual situation before us, treating it as an example of similar factual patterns.

Specifically, we are faced first with the validity of the initial stop of a bicycle operator by police officers who had seen him violate a traffic law by failing to stop at a stop sign after the officers' attention had been attracted by behavior which was somewhat unusual, but which did not constitute grounds for a reasonable suspicion that the operator had committed a crime. More generally stated, the first issue before us is whether an officer may validly stop a person who has committed a minor offense in the officer's presence when the officer's curiosity or suspicion has first been aroused by other behavior which would not itself justify a stop. For purposes of analysis we will further assume that the officer might not have noticed the violation itself if his attention had not been attracted by the earlier behavior or appearance and that were it

arrests or arrests without probable cause, may abuse their sworn duty to obey the law, as well as to enforce it, do not in our opinion provide valid reasons why this court should not at this time recognize and adopt the rule of *Robinson.* "270 Or at 188.

[5] "* * * The words which have been found in the past are much spoken of, have acquired a dignity of their own, and to a considerable measure control results. As Judge Cardozo suggested in speaking of metaphors, the word starts out to free thought and ends by enslaving it. The movement of concepts into and out of the law makes the point. If the society has begun to see certain significant similarities or differences, the comparison emerges with a word. When the word is finally accepted, it becomes a legal concept. Its meaning continues to change. But the comparison is not only between the instances which have been included under it and the actual case at hand, but also in terms of hypothetical instances which the word by itself suggests." Levi, *An Introduction to Legal Reasoning* 8 (1949) (footnote omitted).

not for the curiosity or suspicion so aroused the officer would probably not have stopped the violator for the offense that he observed.

 Stopping a vehicle and detaining its occupants is a "seizure" of the person within the meaning of the Fourth Amendment to the Constitution of the United States, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* ___ US ___, 59 L Ed 2d 660, 667 (1979). The decision to make such a stop may not depend solely upon the "standardless and unconstrained discretion" of the officer in the field. *Id.* at 672.

A police officer's statutory authority to stop a person who has committed an offense in the officer's presence, although not expressed in terms of a "stop," is clear. ORS 133.310(1) provides that a peace officer may "arrest a person without a warrant if the officer has probable cause to believe that the person has committed" any offense in the officer's presence.[6] ORS 484.100(1) provides:

> "A police officer may arrest or issue a citation to a person for a traffic offense at any place within the jurisdictional authority of the governmental unit by which he is authorized to act."

The authority to stop is a necessary part of the authority to arrest or to issue a citation.

 Such a stop, clearly authorized by statute, is reasonable for constitutional purposes based on probable cause when the offense has been committed in the officer's presence and no warrant or additional justification is required. *See Hunter v. Clardy,* 558 F2d 290 (5th Cir 1977). An officer who stops a vehicle when

---

[6] ORS 133.310(1) provides, in full, that:

"A peace officer may arrest a person without a warrant if the officer has probable cause to believe that the person has committed:

"(a) A felony, a Class A misdemeanor, an unclassified offense for which the maximum penalty allowed by law is equal to or greater than the maximum penalty allowed for a Class A misdemeanor, or a major traffic offense as defined in subsection (5) of ORS 484.010; or

"(b) Any other offense in the officer's presence."

he sees its operator commit a traffic violation does not interfere with the operator's freedom of movement based only on the officer's "standardless and unconstrained discretion." We see no reason to hold that such a stop is improper or invalid simply because, in addition to probable cause to arrest for a specific offense (or to stop for purposes of issuing a citation), the officer also has a suspicion which contributes to the decision to make the stop. Nor do we believe that determining the validity of an otherwise authorized stop on the basis of the officer's purpose, or primary purpose, in making it would be either practical or desirable.

Although some courts have made statements in the course of opinions holding that evidence should be suppressed, indicating that a stop or an arrest was improper because of the arresting officer's motive, we do not believe those cases actually stand for a lack of authority to make the stop at all.[7] No one has contended, either in this case or in the cases cited by defendant, that a citation for the minor offense should be dismissed because the stop was improper. The real concern in those cases was not the validity of the stop itself, but rather the events which followed it and which led to the discovery of evidence of other unrelated offenses.

The Court of Appeals stated in *State v. Carter/Dawson,* 34 Or App 21, 28, 578 P2d 790 (1978) review pending, that a portion of our decision in *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977), can be read

---

[7] *See, e.g., Lane v. Commonwealth,* 386 SW2d 743 (Ky 1965); *State v. Cotterman,* 544 SW2d 322 (Mo App 1976); *People v. Sapp,* 43 Misc 2d 81, 249 NYS2d 1020 (1964); *State v. Michaels,* 60 Wash 2d 638, 374 P2d 989 (1962); *Barnes v. State,* 25 Wis 2d 116, 130 NW2d 264 (1964). Other cases cited by defendant on this issue are not convincing authority to the contrary. In *People v. James,* 44 Ill App 3rd 300, 3 Ill Dec 88, 358 NE2d 88 (1976) the court concluded that there had been no traffic violations to justify the stop. The rationale in *People v. Flanagan,* 56 AD2d 658, 391 NYS2d 907 (1977) is not entirely clear, but it appears that the state relied not on the observed traffic offense (double parking) but on a general power to stop any vehicle and inquire as to the ownership.

as applying a subjective test in the determination of the validity of a vehicle stop. In that case we held (at 628) that an avowedly investigatory stop was improper because the circumstances, viewed objectively, were insufficient to give rise to reasonable suspicion of a crime under ORS 131.615. In the opinion, however, we indicated (at 624), without discussion, that we were disregarding evidence of a minor traffic violation because the officer who observed the violation testified that it was not the reason for the stop. *Valdez* was presented to both the Court of Appeals and this court as a case involving the validity of an investigatory stop. The state did not contend that the stop was justified by the traffic infraction and we did not decide the case on that basis.

*Valdez* simply holds that when a police officer says that although he observed a traffic violation he actually made a stop for an entirely different reason, and was not concerned with enforcement of the traffic laws, the courts will take him at his word. It does not hold that when an officer sees a traffic violation, and when he stops the violator for the avowed purpose of citing for that violation, the court will hold the stop improper for purposes of the exclusionary rule if it concludes that the officer also had other motives for the stop.[8]

Judge Tanzer, dissenting in *State v. Carter/Dawson,* would hold that evidence of other offenses discovered during a traffic stop should not be admissible unless either (1) the officer would have made the stop for that violation even if he did not suspect possible criminal activity and want to investigate further; or (2) the

---

[8] Earlier cases decided by this court are not helpful. In *State v. Christensen,* 151 Or 529, 51 P2d 835 (1935) two members of the court thought the stop was justified by the possibility of a violation of the basic rule, but a majority relied upon probable cause to search the vehicle for evidence of a violation of the liquor laws. In *State v. Allen,* 248 Or 376, 434 P2d 740 (1967), both the majority opinion and the dissenting opinion by Justice O'Connell focused not on the initial stop but on the subsequent custodial arrest and its consequences.

officer had grounds for reasonable suspicion of criminal activity which would justify a stop without regard to the traffic offense. We believe this approach would be unworkable. Any time evidence of criminal activity came to light during a routine traffic stop, trial courts would be called upon to decide whether the officer had noticed anything about the violator or the vehicle beyond the fact of the violation itself and, if so, whether he would have made the stop upon the hypothetical supposition that he had noticed nothing. The Constitution does not require such a strained approach.

For these reasons we conclude that neither reason nor authority supports the argument that an otherwise authorized stop is itself rendered invalid by the arresting officer's hope or belief, even if that hope or belief is one of the reasons for his action, that evidence of some other offense may come to light during the course of the encounter. We agree with those courts which have expressly approached the question of the validity of a stop or arrest on an objective, rather than a subjective, basis.[9]

[9] *See, e.g., United States v. McCambridge,* 551 F2d 865, 870 (1st Cir 1977); *United States v. Seay,* 432 F2d 395, 402 (5th Cir 1970); *Hutcherson v. United States,* 345 F2d 964 (DC Cir 1965); *State v. McCarthy,* 452 SW2d 211, 213-14 (Mo 1970); *Shackelford v. State,* 473 P2d 330 (Okla Cr 1970).

We have found only one case which appears to hold that a stop or an arrest (as distinct from the surrounding or subsequent behavior of the police) is invalid based on police motives alone. *United States v. Cruz,* 581 F2d 535 (5th Cir 1978). If that is, indeed, its holding we decline to follow it.

*Taglavore v. United States,* 291 F2d 262 (9th Cir 1961) is often cited as an example of an arrest which was invalid because made for improper purposes. In that case an arrest warrant was obtained by a vice squad officer who observed the defendant commit two minor traffic violations, but who did nothing about them at the time. The next day he obtained the warrant based on those violations, but delayed having it served until late that night at a time when he apparently had some reason to believe defendant might have marijuana in his possession. The officers sent to make the arrest were instructed to search for the drug, and did so by attacking the defendant when he put something in his mouth during the service of the warrant. One of them sat on his stomach while the other choked him until the officers were able to recover the remains of a marijuana cigarette which the defendant was attempting to swallow. The

*The officers were justified in taking defendant into custody for the purpose of establishing his identity.*

■ Defendant committed a traffic violation in the officers' presence, and was therefore subject to at least the issuance of a citation. That citation could not be completed without knowing defendant's identity. ORS 484.150(3)(b).[10] When the officers were given conflicting information as to defendant's identity, they were justified in taking additional steps in order to make sure that a traffic violation charge would be made against the proper person.

Citation for a minor traffic offense requires the offender to either appear in court or remit, prior to the date for court appearance, the amount of bail appropriate to the offense. ORS 484.190(2). The officer has no authority to accept bail in the form of cash although, under limited circumstances, he may accept security

---

court held that even if there was probable cause for search when the defendant placed something in his mouth and tried to run away, that probable cause

"* * * was a direct product of the illegal attempt to arrest and search appellant on the traffic warrant. The police engaged in a deliberate scheme to evade the requirements of the Fourth Amendment by using a traffic arrest warrant to search appellant for narcotics they suspected he had on his person. * * * Here * * * we have a deliberate, pre-planned attempt by the police to violate a suspect's constitutional rights by engaging in a subterfuge." 291 F2d at 267.

We need not decide whether we would follow *Taglavore* in a case involving comparable facts. That case involved not merely a traffic stop for other or additional purposes, but the obtaining of a warrant for minor traffic offenses and a deliberate delay in serving the warrant until such time as the police believed a search of the person might yield evidence of another crime. If the arrest was invalid from the outset, as the court appears to hold, that was not merely because of the arresting officers' motives, but also because of the timing and manner of the arrest itself. It is distinguishable from cases such as this case, in which officers make an on-the-spot stop of a traffic violator immediately after an observed offense. Also compare *White v. United States,* 271 F2d 829 (DC Cir 1959).

[10] ORS 484.150(3)(b) provides:

"(3) Each of the parts [of a traffic citation] shall contain the following information or blanks in which such information shall be entered:

"* * * * *

"(b) The name of the person cited."

in the form of a qualifying automobile association membership card or a guaranteed arrest bond certificate. ORS 484.120(1), (2). In normal circumstances, security must be submitted to a magistrate or designated clerk. ORS 484.120(4).

It follows that in order to insure that a traffic offender will perform his obligation to either appear in court or post bail the officer must have authority to make certain of an offender's identity before citing and releasing him. It also follows, in our opinion, that when, as under the circumstances of this case, the information available at the scene of the stop shows uncertainty as to defendant's true identity, an officer acts reasonably if he requires the defendant to go to the police station while steps are taken to determine his identity.

The limits of our holding on this point should be made clear. ORS 484.100(1) authorizes a police officer to arrest a person for a minor traffic offense.[11] In the context of a traffic stop, ORS 484.435 contemplates the possibility of a "full custody arrest," but does not say when such an arrest may be made.[12] We are not required in this case to consider the limits of a police officer's authority to make an arrest for a minor traffic offense. *Cf. Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 108, 570 P2d 52 (1977), and *id.* 280 Or at 114

---

[11] ORS 484.100(1) provides in full:

"A police officer may arrest or issue a citation to a person for a traffic offense at any place within the jurisdictional authority of the governmental unit by which he is authorized to act."

[12] ORS 484.435 provides in full:

"(1) Searches and seizures otherwise authorized by law incidental to an arrest shall not be authorized if the arrest is on a charge of committing a Class B, C or D traffic infraction unless the arrest is a full custody arrest in which the person arrested is to be lodged in jail, and the decision to place the person arrested under full custody arrest is based upon specific articulable facts justifying his being lodged in jail rather than being given a traffic citation as provided in this chapter and released.

"(2) Nothing in subsection (1) of this section shall be construed to forbid a frisk for dangerous or deadly weapons authorized under ORS 131.605 to 131.625."

(Holman, J., dissenting). We need not and we do not hold that the defendant in this case could have been "arrested" as that term is understood in common usage—that he could have been held in jail, unless he posted bail, to answer to a charge of running a stop sign. We consider here only the reasonableness of a temporary detention, for a limited purpose, under the particular facts of this case.

This defendant was detained at the police station for a period of about two hours while his identity was under investigation. During that period, which is not an inherently unreasonable length of time,[13] the police learned that the television set and bicycles had been stolen only that morning. Those items were then, of course, properly subject to seizure.

For all of these reasons, we hold that the original traffic stop was reasonable; that defendant's rights were not violated by questioning him about his identity during that stop; that when the police officers were given conflicting information about defendant's identity they acted reasonably in detaining him until his identity could be established; and that they received information justifying the seizure of the stolen items while that investigation was being conducted. The trial court did not err in denying defendant's motion to suppress the evidence against defendant.

The decision of the Court of Appeals is affirmed.

---

[13] We do not intend to suggest that the police may hold a traffic offender whose identity is in question for any particular period of time. Once identity is satisfactorily established the offender should be cited and released unless grounds for further detention appear. In the present case, defendant's identity had not yet been satisfactorily established when the new information was received. Two hours is not so long a period as to indicate, of itself, that the police were not proceeding with their investigation in good faith.