**STATE of Missouri, Respondent,**

v.

**Darrel Lee COTTERMAN, Appellant.**

**No. KCD 28448.**

Missouri Court of Appeals,
Kansas City District.

Nov. 29, 1976.

Robert G. Duncan, William E. Shull, Jr., Duncan & Russell, Gladstone, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Defendant was charged by way of an information with possession of a controlled substance (Section 195.020, RSMo Supp. 1971). Having waived a jury, he was tried to the court, found guilty as charged, and sentenced to two years confinement in the custody of the Missouri Department of Corrections.

Prior to trial defendant filed a motion to suppress the controlled substance which was the gravamen of the offense. The motion was grounded on the proposition that the controlled substance was seized from defendant's person by means of an unreasonable warrantless search in violation of the Fourth Amendment of the Constitution of the United States. The motion to suppress was not taken up until the day of the trial. Evidence pertaining to the motion, by stipulation, was limited to the contents of two depositions taken of Troopers Fred Suroff and E. J. Dayringer by defendant's attorney in connection with an action initiated by the troopers for the forfeiture of defendant's automobile under Section 195.145, RSMo 1969. At this stage of the proceeding, the defendant and the state further stipulated, subject to defendant's continuing objection that the controlled substance was the fruit of an "unlawful search and seizure", that the evidence relative to defendant's motion to suppress and an open court admission by defendant that one of the state's witnesses, a chemist, if called, would testify that the substance removed from defendant's person was "methamphetamine", a "schedule 2 controlled substance", constituted all the evidence to be presented at defendant's trial on the merits of the case. A jury was waived and the motion to suppress and the case on its merits were simultaneously submitted to the court per the joint stipulations and open court admission. The motion to suppress and the principal case were taken under advisement by the trial court and it subsequently overruled the motion to suppress and found defendant guilty as charged. Thereafter judgment was entered and sentence was imposed.

Defendant claims on appeal that the trial court erred in not sustaining his motion to suppress the controlled substance because it was obtained by an unreasonable warrantless search in violation of the Constitution of the United States (Fourth Amendment).

As aptly stated in *Sibron v. New York*, 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20

L.Ed.2d 917, 932 (1968), "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." The "concrete factual context" of this case must be determined by melding the deposition testimony of Troopers Suroff and Dayringer.

At approximately 1:50 P.M. on March 6, 1975, both troopers were in a Missouri State Highway patrol car which was stopped at a stop sign posted against northbound traffic on Grand Street in Sedalia, Missouri, at the intersection of Grand and 32nd Streets. While stopped they observed a late model "white Buick convertible" travelling east on 32nd Street. As the Buick proceeded through the intersection the driver "looked over towards us [the troopers] and then he abruptly turned away and slid down". The troopers were unaware of the identity of the driver of the Buick. Solely on the basis of the limited facts just stated, the troopers became "suspicious" that the white Buick convertible "was a stolen vehicle". Braced with their suspicion they proceeded to "tail" the white Buick convertible with the thought of running a license check on the vehicle. Before they had a chance to do so they observed the driver of the Buick "reach way down, as if to obtain an object or place an object under the right front seat" and as he did so the Buick abruptly swerved to its left and across the center line. At this point Trooper Suroff "put the red lights of the patrol car on" for the purpose of stopping the Buick. Immediately thereafter the driver of the Buick swerved back to the right hand side of 32nd Street and stopped his vehicle. The troopers did not stop the Buick for the purpose of arresting the driver for violation of a traffic regulation committed in their presence.[1] The troopers bluntly denied that they arrested or attempted to arrest the driver of the Buick for a traffic offense. To the contrary, the troopers, with commendable candor, testified that they stopped the Buick because they were dually "suspicious" that the vehicle might be "a stolen car" and that the driver "had a weapon". The troopers attributed their dual suspicions to "three things": (1) the initial conduct of the driver in turning his face away from them and sliding down in his seat as he passed through the intersection; (2) conduct on the part of the driver which was characterized by the troopers as an attempt to remove or place an "object" under the right front seat of his vehicle; and (3) the erratic movements of the Buick while it was being "tailed" by the troopers.

The patrol car stopped behind the Buick and the two troopers got out and "cautiously" approached the driver's side of the Buick. As they did so, the driver, the defendant, opened the door on the driver's side and at the same time "got low in the seat" with his right arm positioned "low in his lap". At that moment Trooper Suroff ordered defendant to "[p]lace [his] hands where [he could] see them" and then proceeded to "pull" defendant out of the Buick. As defendant was being removed from the Buick he was ordered to give his name or otherwise identify himself, but refused to do so. After removing defendant from the Buick, Trooper Suroff ordered defendant to "place his hands on the car" and then "frisked him [defendant] for a weapon". Trooper Suroff's testimony reveals that he used the term "frisk" as being synonymous with "pat-down". Defendant was wearing a jacket at the time. The "frisk" or "pat-down" of defendant revealed an object in defendant's right jacket pocket which "felt like the butt of a small automatic". There is not a whit of evidence that the frisk or pat-down revealed any object which felt like a weapon in defendant's left jacket pocket or that Trooper Suroff visually observed anything in the area of defendant's left jacket pocket which appeared to be a bulge or which otherwise might indicate the presence of a weapon. The state argues in its brief that "[n]owhere in the transcript does it say whether or not the officer patted the second pocket or went directly into it without patting". The state's reference to the "transcript" obviously refers to the

---

1. See: Section 304.015.2, RSMo 1969, and Section 43.195, RSMo 1969.

depositions given by Troopers Suroff and Dayringer. The state stipulated that evidence pertaining to defendant's motion to suppress consisted solely of the testimony of Troopers Suroff and Dayringer as disclosed by their depositions. This court on the basis of a holistic review of the evidence concludes that the "pat-down" conducted by Trooper Suroff did not suggest the presence of a weapon in defendant's left jacket pocket and that Trooper Suroff did not visually observe anything indicating a weapon in the area of defendant's left jacket pocket. Were it otherwise, it seems only fair to assume that the state would have presented evidence which indicated to Trooper Suroff the presence of a weapon-like object in defendant's left jacket pocket before he intruded into that pocket.

Trooper Suroff, relying on the facts heretofore set forth as justification for doing so, reached into defendant's right jacket pocket and removed what initially felt to him like "the butt of a small automatic". However, instead of being an "automatic", the right jacket pocket of defendant contained only a "considerable sum of money" which was "folded in half". Trooper Suroff testified that at this point his "suspicion rose to the fact that maybe he [defendant] had just held up a place". This was a raw suspicion at best since Trooper Suroff had no knowledge by way of a report or otherwise that a robbery had recently been committed. Buttressed with the bare suspicion that "maybe he [defendant] had just held up a place", and absent any ratiocinative basis induced by tactile or visual senses from which to reasonably conclude that defendant's left jacket pocket contained a weapon of some kind, Trooper Suroff reached into defendant's left jacket pocket and removed an additional sum of money folded around a "plastic Baggi with a white powdery substance". The record is silent as to the size and dimension of the "plastic Baggi" and its contents. Defendant was then placed under arrest for possession of a controlled substance.

Defendant does not contest the action of the troopers in stopping him and conducting a protective search for weapons. He does contend, however, that the search which resulted in the discovery and seizure of the controlled substance was unreasonable in its scope and therefore cannot be constitutionally justified as a protective search for weapons when measured by the criteria laid down in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The state, citing *Terry*, contends otherwise and seeks to uphold the constitutionality of the search as falling within the "stop" and "frisk" exception.

In *Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1879, the Supreme Court carefully pointed out that ". . . in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." The Supreme Court in *Terry* further emphasized the latter aspect of the "dual" inquiry regarding a protective search for weapons, 392 U.S. at 28–29, 88 S.Ct. at 1883: "The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation. . . . The entire deterrent purpose of the rule excluding evidence seized in violation of the Fourth Amendment rests on the assumption that 'limitations upon the fruit to be gathered tend to limit the quest itself.' . . . Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." The Supreme Court then proceeded to tightly circumscribe the scope of a warrantless protective search for weapons: "The sole justification of the search in the present situation is the protection of the police officer and others nearby, *and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.*"

(Emphasis added.) 392 U.S. at 29, 88 S.Ct. at 1884. The Supreme Court made the following factual observation in *Terry*, 392 U.S. at 29–30, 88 S.Ct. at 1884, regarding the scope of the search therein involved: "Officer McFadden patted down the outer clothing of petitioner and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his pat-down which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find." The court in *Terry* concluded that the "carefully limited" protective search for weapons disclosed by the facts, coupled with the existence of "articulable facts"[2] which justified its initiation, was not unreasonable in its scope and, perforce, was not proscribed by the Fourth Amendment.

■ The apical issue in this case is now reached. Assuming, arguendo, but not deciding, that the evidence demonstrated "articulable facts" from which the troopers could "reasonably . . . conclude . . . that criminal activity . . . [was] . . . afoot"[3] and that defendant might "be armed and presently dangerous",[4] thereby justifying initiation of a protective search for weapons, did the trooper's search of defendant's left jacket pocket go beyond the scope of one "reasonably designed" to discover the presence of a weapon upon the person of defendant? This court concludes that it did. The only indicium of a weapon upon defendant's person, as a result of the frisk or pat-down which was conducted, was an unknown object or substance in defendant's right jacket pocket which felt like the "butt of a small auto-

matic". The frisk or pat-down failed to reveal any object or substance which felt like or might have led the trooper to believe that a weapon was contained in defendant's left jacket pocket. Nor was anything visually observed with respect to defendant's left jacket pocket which could be construed as some indicia of the presence of a weapon. What the trooper characterized as feeling like the "butt of a small automatic" in defendant's right jacket pocket during the course of frisking or patting down the defendant turned out to be a sum of money in the form of some folded bills. Although the amount of money represented by the folded bills was never disclosed, their presence triggered a raw suspicion in the trooper's mind that a robbery had recently occurred and without any facts upon which to reasonably conclude that defendant's left jacket pocket contained a weapon the trooper launched a purely exploratory search of defendant's left jacket pocket and by chance found the controlled substance in question. The search conducted with respect to defendant's left jacket pocket failed to comport with the limitations placed upon the scope of a protective search for weapons as spelled out in *Terry v. Ohio*, supra. Any temptation in a marginal case such as this to gloss over the "concrete factual context" in which the apical issue at hand reposes, must be resisted. If one succumbs to such a temptation he might superficially conclude that justification for a protective search for a weapon in defendant's right jacket pocket could be transposed, ipso facto, as justification for an unlimited exploratory search of defendant's left jacket pocket, thereby insulating the latter search from being branded as constitutionally unreasonable and violative of the Fourth Amendment. The danger of doing so lies in the fact that any protective search for weapons, however limited in its scope, could be parlayed by minimal innovativeness into justification for a full blown search of a person. Judicial guidelines for determining the reasonableness or unrea-

---

2. *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880.

3. *Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884.

4. Id.

sonableness of the scope of a protective search for weapons would be shunted and the "concrete factual context" of individual cases would be reduced to nothing more than a rorschach inkblot, thereby relegating the decisional process of determining reasonableness or unreasonableness, in a constitutional sense, to unbridled individual notions. Determination of such a vital constitutional question must rest upon something far more substantial. Criteria espoused in prior judicial decisions must be resorted to and, when such is done in the instant case, *Terry v. Ohio*, supra, comes to the forefront. As gauged by the criteria laid down in *Terry*, the search of defendant's left jacket pocket which uncovered the presence of the controlled substance on defendant's person exceeded the bounds of a reasonable protective search for a weapon and went beyond the scope of a search conducted for that purpose. Therefore, the search in question cannot be constitutionally upheld as a reasonable "stop" and "frisk" warrantless search within the purview of *Terry v. Ohio,* supra.

The state alternatively contends that the search of defendant's left jacket pocket was constitutionally permissible because it constituted "a search incident to a lawful arrest" or because "there was probable cause, without referring to the search, to arrest [defendant]." Both of these alternative contentions are at variance with the "concrete factual context" of the case at hand.

█ The "lawful arrest", to which the state claims the search was incident, was a traffic violation which occurred in the troopers' presence, i. e., defendant's failure to drive his vehicle "upon the right half of the roadway". Section 304.015.2, supra. If the troopers had in fact effected a custodial arrest of defendant for a violation of a traffic regulation committed in their presence prior to searching defendant's left jacket pocket, case law exists to support the constitutionality of a search in such a context. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct.

488, 38 L.Ed.2d 456 (1973); and *State v. Moody*, 443 S.W.2d 802 (Mo.1969). But no custodial arrest of defendant for violation of a traffic regulation occurred. To find that the troopers effected a custodial arrest of defendant for violation of a traffic regulation prior to searching his left jacket pocket would rebuff the clear import of all the evidence. The troopers did not stop defendant for the purpose of arresting him for violation of a traffic regulation. They candidly admitted that defendant's erratic driving was viewed by them merely as one of several instances of unusual conduct on defendant's part which caused them to reasonably conclude that the automobile which defendant was driving might have been a stolen vehicle. With equal candor, the troopers stated that they stopped defendant for the purpose of investigating his suspicious conduct and they bluntly denied that they ever arrested him for violating a traffic regulation. Concerning the state's contention that defendant was arrested for violation of a traffic regulation, it is unnecessary to decide if objective facts or subjective intent controlled determination of whether there was an arrest for the traffic violation. Suffice it to say, total rejection of the troopers' positive testimony that they did not stop or arrest defendant for violation of a traffic regulation would do violence to the principle that search and seizure questions are to be resolved in the "concrete factual context of the individual case". The state's contention that defendant was arrested for violation of a traffic regulation must fail when measured by the "concrete factual context" of this case. Since there was no lawful arrest of defendant for violation of a traffic regulation it necessarily follows that there could be no search incident to a non-existent arrest. To hold otherwise might well be construed as suggesting to law enforcement personnel that they would be on constitutionally safe ground to stop motorists who violated a traffic regulation in their presence and conduct an unlimited search of such persons when there was no intent to place them under custodial arrest for the traffic viola-

tion and no facts existed otherwise to indicate a warrantless search. At this point it is appropriate to be reminded ". . . that the rights of privacy and personal security protected by the Fourth Amendment ' * * * are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen * * * ' ". *Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399 (1947).

■ The state cannot fall back on defendant's arrest for possession of a controlled substance to constitutionally validate the search as being one incident to a lawful arrest. "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification." *Sibron v. New York*, 392 U.S. at 63, 88 S.Ct. at 1902. See also: *State v. Witherspoon*, 460 S.W.2d 281 (Mo.1970); and *Kansas City v. Butters*, 507 S.W.2d 49 (Mo.App.1974).

■ Finally, the state seeks to justify the warrantless search on the premise that "there was probable cause, without reference to the search, to arrest" defendant. Once again the state relies upon defendant's violation of the traffic regulation heretofore mentioned. The state facilely argues "that the search . . . was constitutional because there was probable cause to arrest . . . [defendant] . . . for the traffic violation and the search was equivalent to a search incident to a lawful arrest." This can only be viewed as an attempt by the state to circuitously reargue that the search was incident to defendant's purported lawful arrest for violation of a traffic regulation. Having already concluded that defendant was neither stopped nor placed under custodial arrest for violation of a traffic regulation, its present argument is patently fallible. It would be incongruous to give weight or credence to the state's argument that "the search was equivalent to a search incident to a lawful arrest" when no such arrest occurred. Otherwise, cause to arrest for violation of a traffic regulation, standing alone, would insulate an unlimited search of a person from being attacked as constitutionally unreasonable within the meaning of the Fourth Amendment. It would clothe such searches with the same constitutional imprimatur given searches incident to lawful custodial arrests. The state has failed to cite any cases which go so far. *United States v. Robinson,* supra, *Gustafson v. Florida,* supra, and *State v. Moody,* supra, do not lend authoritative support to such a far-reaching proposition. The implication of the state's argument is glaringly obvious. A right to conduct an unlimited search based upon probable cause or cause in fact to arrest a motorist for violation of even the most routine traffic regulation, even though no arrest in fact occurred, would emerge as a new exception to the Fourth Amendment's proscription of "unreasonable searches and seizures". This court lacks the power or inclination to carve such an exception.

The controlled substance was obtained by means of an "unreasonable search" in violation of the Fourth Amendment to the Constitution of the United States and defendant's motion to suppress should have been sustained.

The judgment is reversed.

All concur.